[Civ. No. 2648. Fourth District.—June 3, 1941.]

FRIEND W. RICHARDSON, as Superintendent of Banks, etc., Respondent, v. HERMAN MICHEL et al., Appellants.

Ivan G. McDaniel and George C. Lyon for Appellants.

John Gee Clark, Clyde Doyle, Walter Desmond, Jr., and Sullivan, Roche & Johnson for Respondent.

BARNARD, P. J.—This is an action to set aside certain allegedly fraudulent transfers of property. In 1931, the defendant Herman Michel owned some 780 shares of stock in the Marine Bank of Santa Monica. He was then 56 years of age, was president of the Marine Bank, president of the Santa Monica Dairy Co., an officer of the Imperial Ice Co., and was mayor of the city of Santa Monica. He also owned certain other real and personal property.

On August 28, 1931, Michel caused to be incorporated the Michel Investment Co., Inc., and a few days later he transferred all of his real and personal property, with the exception of his stock in the Marine Bank, to that corporation. in exchange for 922 shares of its stock. The assets thus

transferred to the corporation were reported to the Corporation Commissioner as having a cost value of $299,179.58. These 922 shares were issued to him and on September 16, 1931, he gave all of them, without consideration, to his wife and children, transferring varying numbers of shares to each. On October 1, 1931, under his direction, his wife and children created a voting trust exchanging their shares of stock for certificates of beneficial interest in the voting trust. Herman Michel was appointed trustee to vote the stock, and the control of the voting trust was placed in the hands of a beneficiaries committee appointed by the certificate holders.

On December 1, 1931, Herman Michel was defeated in his campaign for reelection as mayor. Shortly thereafter, he attempted to secure from another bank a loan of $100,000 for the Marine Bank, to be secured by mortgages having a face value of $250,000. On the day this loan was refused he requested the Superintendent of Banks to take charge of the Marine Bank and on December 18, 1931, that bank was closed. In February, 1932, the Superintendent of Banks levied an assessment upon the stockholders of that bank, including Herman Michel. His assessment not being paid, the same was reduced to judgment on August 11, 1933, which judgment has become final. (*Rainey* v. *Michel*, 6 Cal. (2d) 259 [57 Pac. (2d) 932, 105 A. L. R. 148].) The present action was begun June 8, 1937, some three years and ten months after the other judgment was entered and some thirteen months after the appeal in that case was decided. The court found in all respects in favor of the plaintiff herein and a part of the defendants have appealed.

The appellants first contend that the court's findings to the effect that the transfers were made with fraudulent intent are entirely unsupported. The evidence is rather voluminous and it would serve no useful purpose to completely review it here. In general, appellants argue that the evidence discloses that Michel had begun to plan to make these transfers as early as the fall of 1930; that he believed the bank to be in good condition at the time the transfers were made; that the condition of the bank had been improving for some months before that time; that it continued to improve for a month or two thereafter; that the closing of the bank in December was brought about by heavy withdrawals for the payment of taxes at that season, and also

by the loss of a large number of deposits brought about by his defeat for reelection as mayor; and that nothing appears except a natural desire on the part of Michel to turn over a large part of his property so that his children might learn to manage it, while he kept for himself the bank business in which he was most interested. Portions of the evidence are cited in support of these views and it is argued that they justify and compel inferences contrary to those drawn by the trial court, with the result that the court's findings are not sustained by the evidence.

From the nature of such a case as this it is usually impossible to produce direct proof of fraudulent intent. In this connection the court said, in *Fross* v. *Wotton*, 3 Cal. (2d) 384 [44 Pac. (2d) 350] : "For this reason and because the real intent of the parties and the facts of the transactions are peculiarly within the knowledge of those sought to be charged with the fraud, proof indicative of fraud must come by inference from the circumstances surrounding the transaction, the relationship and interests of the parties."

The Marine Bank had paid no dividends since 1928, the paying of dividends having been stopped by the Superintendent of Banks because of the bank's condition. Herman Michel had received no salary as president of the bank since 1928. It appears that the condition of the bank had been criticised in examiners' reports for at least a year or two before these transfers were made and a large number of bad loans had been charged off. In an examiners' report, made after an examination in December, 1930, and January, 1931, it was stated that dividends had been postponed by the Superintendent of Banks on account of bad and doubtful notes; that the current examination showed losses amounting to $36,789.45, which would eliminate the undivided profits account and reduce the surplus from $24,000 to $10,000; that the savings department showed an unsatisfactory ratio of loans to deposits with practically no reserve; that the bank's bond investment showed a shrinkage of $22,730; that an annual depreciation on fixtures must be charged, and a large number of the bank's loans were severely criticised. A number of letters between officials of the bank and the Superintendent of Banks were written during the next several months, in which the Superintendent of Banks insisted that various things be done to correct the condition of the bank and in

which the officials apologized for being unable to show more progress, but claimed that every effort was being made in that direction. Among these letters is one written to the Superintendent of Banks on June 29, 1931, in which the banker says:

"We are aware that we have not fully complied with your request in regard to charging off loans, and setting up a reserve for bond depreciation and depreciating our Furniture and Fixture account. Our reason for not complying fully with your request is that, under the present trying conditions, it is necessary that we make as strong a statement as possible, and, if we had charged off all the items you requested, it would have been necessary to charge a portion to Surplus, and this might have caused unfavorable comment by our customers and might have caused us to lose a considerable number of accounts."

The Superintendent of Banks wrote to the Marine Bank under date of July 30, 1931, "We realize that you do not wish to show too weak a statement to the public, but nevertheless, cannot permit you to continue to report a condition which is not substantially correct". And also, "We wish to cooperate with you fully, but feel that there is nothing to be gained by failing to face the situation just as it is and to have a definite program which will put your bank in condition within a reasonable period of time". Herman Michel, when asked to trace the matter of the deposits of the bank "as they existed down to the year 1931", testified: "Well, the deposits kept on declining for some time, and finally we made a change of manager (this was in March, 1931) and brought in Mr. Kibbe and the bank deposits began to pick up. They stayed up until about October, then, they began dropping again". On August 11, 1931, the new manager of the bank wrote to the Superintendent of Banks that they realized "that the depreciation of our bonds is a very serious matter", and that it was their intention to cut down expenses and build up earnings to cover their losses. There is evidence that the bank was in an unsatisfactory condition before and throughout the year 1931, that it had many unsatisfactory loans, that it suffered considerable losses, that its condition was severely criticised by the Superintendent of Banks on a number of occasions with suggestions as to what

must be done, and that the bank officials were unable to fully comply with these suggestions. There is also evidence that these reports and letters were brought to the attention of Herman Michel, that he was in the bank practically every day, and that he had full knowledge of the situation that existed.

While the bank's affairs were in this condition Michel gave away all of his other property, keeping only this bank stock which was neither paying dividends nor leading to a salary. Shortly before the transfer this bank stock had been subjected to a new double liability under the Bank Stockholders Liability Act, which was approved by the Governor on April 24, 1931, and became effective on August 14, 1931. (Stats. 1931, p. 338 [Deering's Gen. Laws, 1937, Act 652a].) At the time he made these transfers he owed $11,000 to another bank and $25,000 to two individuals. The only asset he had remaining, aside from the bank stock, was life insurance with a surrender value of $13,000. The first thing the Michel Investment Company did, after the transaction was completed, was to borrow money from another bank with which to pay the $11,000 debt owed by Herman Michel. Shortly thereafter, when the two persons to whom he owed $25,000 threatened to proceed to set aside these transfers the Michel Investment Company indorsed Herman Michel's note for $25,000 and assumed responsibility for that debt. After the transfers were completed Herman Michel continued to manage the properties, which he had transferred to his wife and children and continued to draw salaries as president of the dairy company and president of the ice company amounting to $15,000 a year, these salaries being paid to the Michel Investment Company.

Without going any further into details it must be held that the evidence in its entirety, with the reasonable inferences therefrom, sufficiently sustains the court's findings with reference to the fraudulent nature of the transfers which are here attacked.

■ Appellants make two assignments of error in connection with the admission of evidence. It is first contended that the report of the bank examiners of the examination made of the Marine Bank in the latter part of December, 1930, and the early part of January, 1931, was inadmissible. It is argued that portions of the report are the conclusions of

the examiners and that since only one of the two examiners was called as a witness the other examiner was not available for cross-examination. The document is sufficiently connected up through the testimony of one of the examiners. The fact that it included certain conclusions of the examiners did not make the document inadmissible and even those matters had a bearing as being things which were called to the attention of Michel. If any of the purported facts set forth in the document were not within the knowledge of the examiner who testified, that fact could have been developed in the cross-examination of that witness. █ The second objection to the evidence is to the admission of three letters written by appellant Walter J. Michel and his attorney, in connection with Walter's disaffirmance of his purchase of certain stock in this bank made while he was a minor. The matter does not seem to be very material, although it had some bearing in connection with another matter which it is unnecessary to discuss in this opinion because of our decision on the main issues. There was no jury and any possible error to which our attention is called in connection with the admission of evidence could not be deemed sufficiently prejudicial to have affected the result or to justify a reversal.

█ Appellants' fourth and fifth points are sufficiently answered by the reasoning and holdings in *Rainey* v. *Michel, supra,* and by the fact that a setting aside of these transfers, through this action, is effective not only as to Michel but as to the other appellants as well.

█ The appellants contend that this action was barred by the provisions of section 338, subdivision 4 of the Code of Civil Procedure, which provides that an action for relief on the ground of fraud must be brought within three years. The respondent, on the other hand, argues that section 343 of that code is controlling here. That section applies only to actions not covered in the preceding sections.

As conceded by both parties this action is based upon section 3439 of the Civil Code, which provides that every transfer of property with intent to delay or defraud any creditor or any person is void against all creditors and their successors in interest. The complaint in this action was based entirely upon fraud. It was alleged and found that certain property was transferred with intent to defraud the plaintiff, and the

judgment declared the transfers fraudulent and void. The gist of the action is fraud, relief is sought on that ground, and the action comes directly within the provisions of section 338, subdivision 4.

The respondent contends, however, that even though this statute is applicable the action was not barred because the period of limitation would not begin to run until execution was issued with a return of *nulla bona*. The real question in this connection is whether the other assets of the debtor must first be exhausted before this action could be maintained. Whether such other assets must first be exhausted depends, usually, on the form of the action which is brought. The general rule as to the remedies available to a creditor seeking to reach property fraudulently transferred is set forth in 12 California Jurisprudence, page 1029, and approved in *Pedro* v. *Soares,* 18 Cal. App. (2d) 600 [64 Pac. (2d) 776], as follows:

" 'A creditor has generally an election of one of three remedies by which he may reach property fraudulently transferred; (1) *having obtained a judgment* upon his claim he may levy upon the property fraudulently conveyed, since the conveyance, so far as he is concerned, leaves the legal title and ownership in the fraudulent grantor; or, (2) he may bring an action in equity to set aside the fraudulent conveyance and subject the property to the satisfaction of his judgment lien, in which case the action is not one on the judgment but is an equitable one for relief against the obstruction caused by the fraudulent transfer which hinders him in satisfying his claim by the ordinary process of law; or (3) he may bring an action in the nature of a creditor's bill for the purpose of subjecting to the payment of his judgment, the money or property transferred or concealed in fraud of his rights'."

In the first of these, where a creditor has sold the transferred property on execution and purchased the same, he may then bring an action to remove the cloud on his title. In such a case the gist of the action is not fraud and the purpose of the action is not to set aside a transfer. The plaintiff is suing as an owner, and not as a creditor, for the purpose of quieting his title as against a cloud thereon, and the rules governing quiet title actions are controlling and the three-year statute of limitations does not apply. (*Hager* v. *Shin-*

*dler,* 29 Cal. 47; *Stewart* v. *Thompson,* 32 Cal. 260; *Scholle* v. *Finnell,* 166 Cal. 546 [137 Pac. 241].)

The second and third remedies above referred to cover different situations where the creditor desires to bring one of the two equitable actions, without first selling the property on execution. The distinction between these two forms of action is pointed out in *Wadsworth* v. *Schisselbauer,* 32 Minn. 84 [19 N. W. 390], as follows:

"There are two classes of cases both commonly called creditor's suits, which, although closely allied, are clearly distinguishable. The first, a creditor's suit, strictly so called, is where the creditor seeks to satisfy his judgment out of the equitable assets of the debtor, which could not be reached on execution. The general rule is that such an action cannot be brought until the creditor has exhausted his remedy at law by the issue of an execution and its return unsatisfied. . . .

"The second class of cases is where property legally liable to execution has been fraudulently conveyed or encumbered by the debtor, and the creditor brings the action to set aside the conveyance or encumbrance as an obstruction to the enforcement of his lien; for, though the property may be sold on execution notwithstanding the fraudulent conveyance, the creditor will not be required to sell a doubtful or obstructed title. In the latter class of cases, the prevailing doctrine is that it is not necessary to allege that an execution has been returned unsatisfied, or that the debtor has no other property out of which the judgment can be satisfied; . . . ".

While some confusion as between these two forms of action appears in some of the language used in some of the decisions in this state, the distinction above noted has been quite generally followed to the extent that issuance of execution and return of *nulla bona* thereon has been required, except in cases where it appears that it would have been useless, in actions in the nature of a creditor's bill, while such a showing has not been required in actions to set aside a conveyance. In some of the earlier cases language was used to the effect that a creditor could not attack a fraudulent transfer until he had exhausted his remedy by judgment, execution and return of *nulla bona.* (*Heyneman* v. *Dannenberg,* 6 Cal. 376; *Bickerstaff* v. *Doub,* 19 Cal. 109 [79 Am. Dec. 204]; *Castle*

v. *Bader*, 23 Cal. 75.) In the later cases, a distinction is made in accordance with the form of the action.

Some of the cases involving a creditor's bill may first be noted. *Pedro* v. *Soares, supra,* was such an action to reach the proceeds of cattle which had been sold pursuant to the foreclosure of a mortgage given to defeat creditors. After pointing out that this was "not an action to set aside a fraudulent conveyance", but that it was "a suit to compel the application of trust funds" to the payment of a creditor's claim which would otherwise be defeated, the court said it was necessary to take out execution and attempt to levy it before the action could be maintained. In *Herrlich* v. *Kaufmann,* 99 Cal. 271 [33 Pac. 857, 37 Am. St. Rep. 50], an attempt was made to reach money in the hands of an assignee for the benefit of creditors. The action was one in the nature of a creditor's bill and no fraudulent conveyance or attempt to set the same aside was involved. While the case was reversed for other reasons, the court remarked that in a case of a creditor's bill for the purpose of reaching assets which were not subject to execution at law it was necessary to allege that an execution had been issued and returned unsatisfied. *Sherman* v. *S. K. D. Oil Co.,* 185 Cal. 534 [197 Pac. 799], was an action by a creditor against the stockholders of a defunct corporation on their liability in equity as holders of watered stock in the debtor corporation. The court stated that this was an equitable action in the nature of a creditor's bill and held that it was necessary to have a judgment against the corporation with return of *nulla bona,* or to otherwise show the insolvency of the corporation. It was also held that the applicable statute of limitations was section 343 of the Code of Civil Procedure, and not section 338, subdivision 4.

Turning then to cases involving actions to set aside conveyances: In *Jenner* v. *Murphy,* 6 Cal. App. 434 [92 Pac. 405], a wife sued to have certain transfers made by her former husband declared void as to her, she having obtained a judgment against the husband. The trial court had found that she had a judgment "upon which she was entitled to an execution". The judgment was affirmed, the court saying: "We have never before heard of a rule that one must be a judgment-creditor and also have gone through the form of a levy and sale under execution before he could maintain an action to set aside a fraudulent conveyance. The con-

tention is not worthy of further discussion." *Sewell* v. *Price*, 164 Cal. 265 [128 Pac. 407], was an action to set aside fraudulent transfers although the court in one place speaks of it as an action "of the kind commonly known as a creditor's bill". A judgment in favor of the plaintiff was affirmed and in speaking of such an action the court said: "It is really an action for equitable relief against the obstruction caused by a transfer which hinders him in satisfying his claim by the ordinary process of law, that is to say by an execution. If, then, he has put himself in a position to levy execution he has done everything necessary to enable him to attack the transfer which hinders his enjoyment of his right."

In *Title Ins. etc. Co.* v. *California Dev. Co.*, 171 Cal. 173 [152 Pac. 542], the court said: "A transfer made with intent to delay or defraud any creditor of his demands is void against all creditors of the debtor. (Civ. Code, sec. 3439.) 'The question of fraudulent intent is one of fact and not of law'. (Civ. Code, sec. 3443.) If that intent was made out, it is not necessary to show that the debtor was insolvent at the time". *Rossen* v. *Villanueva,* 175 Cal. 632 [166 Pac. 1004], was an action to set aside a transfer as having been made with the intent to defraud the plaintiff. While in that case an execution had been issued and returned unsatisfied, the court cited two earlier cases to the effect that when such a plaintiff has put himself in a position to levy execution he may attack the transfer which hinders his rights. In *Adams* v. *Bell,* 5 Cal. (2d) 697 [56 Pac. (2d) 208], an action to set aside a conveyance although an execution had there been returned unsatisfied, the court, in passing on a claim that the defendant was not insolvent at the time of the transfer, said: "As stated above, it is not always necessary to show that a debtor has been stripped of his other assets in order to set aside a fraudulent transfer. Intent to defraud, not present insolvency, is the controlling element in these cases". The principle there applied supports the conclusion that in order to set aside such a transfer it is not essential to have an execution returned unsatisfied.

*Kemp* v. *Lynch,* 8 Cal. (2d) 457 [65 Pac. (2d) 1316], was another action to set aside a fraudulent conveyance. Execution had been issued and returned unsatisfied. However, the court reiterated the rule that in such cases "a judgment

creditor who is in a position to levy execution may bring an action to set aside fraudulent conveyances". In *Widener* v. *Hartnett*, 12 Cal. (2d) 287 [83 Pac. (2d) 718], the court stated that a creditor may attack the transfer as fraudulent when he has reduced his claim to judgment and has endeavored without avail to collect it by execution. This statement, which was in accordance with the facts there appearing, was made in connection with the discussion of a contention that the action was premature since it was brought before the prior judgment had become final. While the statement was undoubtedly true, the question as to whether an attempt to collect by execution was a necessary prerequisite to maintaining an action to set aside a transfer was not before the court and we do not view that case as intending to change the rule in that regard, which had been long established under the other decisions to which we have referred.

Applying these principles to the case now before us, we conclude that since this is an action to set aside fraudulent transfers, it was unnecessary to levy execution and have it returned unsatisfied. It follows that the delay in issuing execution did not have the effect of extending the time at which the statute of limitations would begin to run.

In *Adams* v. *Bell*, *supra*, an action to set aside a fraudulent conveyance, the court said: "Ordinarily, such cause of action would accrue on date of judgment but it has been held that if the creditor knows nothing about the fraudulent conveyance, the cause (in the absence of laches) does not arise until he discovers the fraud by which his rights have been invaded." The time when the period of limitation prescribed by section 338, subdivision 4, began to run in the instant case depends upon whether the respondent had knowledge of the material facts with respect 'to the fraud at the time his judgment was entered or, if not, upon when such facts were discovered, or perhaps should have been discovered, by him. (*Tully* v. *Tully*, 137 Cal. 60 [69 Pac. 700] ; *Adams* v. *Bell*, *supra*.)

While it is alleged that respondent's judgment was secured on August 11, 1933, more than three years before this action was filed, there are no allegations in the complaint as to when the respondent first discovered the fraud, or as to the times and circumstances under which the facts in that connection came to his knowledge. In a fraud action such as

this it is necessary to allege and prove such facts. (*Consolidated R. & P. Co.* v. *Scarborough,* 216 Cal. 698 [16 Pac. (2d) 268].) The rule in these cases is that if the defense of the statute of limitations is properly presented the facts and circumstances surrounding the discovery of the fraud must be shown in order that the court may decide whether they furnish justification for the apparent delay. (*Graham* v. *Los Angeles First N. T. & S. Bk.,* 3 Cal. (2d) 37 [43 Pac. (2d) 543].) In *Adams* v. *Bell, supra,* the court refused to consider a contention, first made on appeal, that the complaint was deficient in the respect just noted, on the ground that the point had not been raised in the trial court, where a suitable amendment might have been permitted, it being also observed that the plaintiff had stated that the facts were not disclosed to her until the return of the execution unsatisfied.

A different situation here appears. The appellants alleged in their answer that the cause of action and all thereof was barred by the provisions of section 338, subdivision 4, and also alleged laches. They further specifically alleged that more than three years had intervened between the date of respondent's judgment and the time this action was brought, and that during all of this time the respondent had possessed full knowledge of the facts. Moreover, the appellants objected to the first evidence offered on the ground that the complaint did not state a cause of action and that the action was barred by the statute of limitations, and argued to the court that over three years had elapsed after the judgment before this action was commenced. The court suggested that counsel put on their case and then submit briefs on these other matters, which seems to have been done.

While this point was thus directly raised and presented in the trial court we are pointed to no evidence, and we can find none, having any bearing on whether the respondent had knowledge of the material facts at the time this judgment was entered, or upon the time and circumstances of his discovery of such facts. Although the court found that the cause of action was not barred by section 338, subdivision 4, or by any other statute of limitations, there is no evidence in the record to sustain that finding. If the respondent had such knowledge at the time his judgment was entered, or if the facts and circumstances surrounding a later discovery

were not sufficient to suspend the running of the statute, the action would be barred. A question of fact was presented which could not be decided in the absence of any evidence as to the material facts.

While the burden was on the respondent to allege and prove the necessary facts to show that his action was not barred it is also true that no evidence was introduced by the appellants supporting their allegation that all facts were known to the respondent at all times from and after the entry of his judgment. It would seem from the record that both parties avoided this important issue in so far as testimony is concerned, with the result that it was decided without any evidence on the point. The practical effect is that there has been no trial on that issue and the record indicates that neither party is free from blame. That portion of the action should be retried and the material facts ascertained before a final judgment is entered.

 The appellants further contend that the respondent was guilty of laches and that the court's finding to the contrary is not sustained. It is argued that they spent money in financing, improving and maintaining portions of the transferred property, that this was done in reliance upon the respondent's delay in attacking the transfers, and that they were injured thereby. This question is closely related to the issue of the statute of limitations. In so far as its other aspects are concerned we are satisfied that the evidence is sufficient to sustain the court's finding. In other words, if the action is not barred by the statute there is nothing in this contention which would justify a reversal.

The fraud issue was very thoroughly tried, and the evidence in support of the findings in that connection is so overwhelming that it cannot be reasonably held that a retrial thereof might be expected to produce a different result, and is such in all fairness, as to obviate the necessity or desirability of such a retrial. The issue as to the statute of limitations, in effect, was not tried at all. The respondent, if he so desires, should be permitted to amend his complaint, and the material facts should be ascertained and that issue decided upon the evidence produced.

The judgment is reversed and the cause remanded for a retrial on the sole issue as to the statute of limitations, with directions to the trial court to make the appropriate finding,

to enter judgment in favor of the defendants if the action is found to be barred by the statute, and if the contrary is found to enter judgment in favor of the plaintiff for the amount of the original judgment, with accrued interest.

Marks, J., and Griffin, J., concurred.

A petition for a rehearing was denied July 1, 1941, and respondent's petition for a hearing by the Supreme Court was denied July 30, 1941.