[No. D021806. Fourth Dist., Div. One. Feb. 10, 1997.]

MANUEL CORTEZ, Plaintiff and Appellant, v.
WILLIAM VOGT et al., Defendants and Respondents.

918

COUNSEL

Phillips, Campbell, Haskett, Noone & Ingwalson, Frederick C. Phillips, Davis, Reno & Courtney, Alan C. Davis, Cindy O'Hara, Laurie Erdman and Andrean Kalemis for Plaintiff and Appellant.

Luce, Forward, Hamilton & Scripps, Lawton Law Firm, Dan Lawton and Kelly Capen Douglas for Defendants and Respondents.

OPINION

NARES, J.—Under the Uniform Fraudulent Transfer Act (UFTA), embodied in Civil Code[1] section 3439 et seq., on April 30, 1993, Manuel Cortez filed an action against William Vogt, Betty Vogt and Doe defendants (collectively, the Vogts) seeking to set aside an alleged fraudulent transfer occurring in August 1987. On May 20, 1994, the trial court granted summary judgment in favor of the Vogts, finding the complaint is barred by the statute of limitations set forth in section 3439.09.

Cortez appeals, contending (1) the four-year statute of limitations of section 3439.09 was tolled during the pendency of an appeal in the underlying action for wrongful termination against two corporations which were merged into another corporation during the underlying action with the assets ultimately being transferred to a corporation that did not assume the then-unsettled, but potential liability; (2) the one-year statute of limitations of section 3934.09, subdivision (a), did not begin to run until the debtor examination of William Vogt in March 1993, after the judgment against the corporations in the underlying action was final; and (3) the Vogts should be equitably estopped from asserting the statute of limitations defense.

Section 3439.09, subdivisions (a) and (b) provide in part that an action by a creditor against a debtor for relief against a transfer or obligation under the UFTA is extinguished unless the action is brought "within four years after the transfer was made or the obligation was incurred." Section 3439.09, subdivision (a) also provides for a longer statute of limitations of one year after the transfer was or reasonably could have been discovered if the transfer was made with the intent to hinder, delay or defraud any creditor. Section 3439.09, subdivision (c) provides that notwithstanding any other provision of law an action with respect to a fraudulent transfer is "extinguished if no action is brought or levy made within seven years after the transfer was made or the obligation was incurred."

[1]All statutory references are to the Civil Code unless otherwise specified.

In the context of the scheme of law of which section 3934.09 is a part, where an alleged fraudulent transfer occurs while an action seeking to establish the underlying liability is pending, and where a judgment establishing the liability later becomes final, we construe the four-year limitation period, i.e., the language, "four years after the transfer was made or the obligation was incurred," to accommodate a tolling until the underlying liability becomes fixed by a final judgment. Thus, in this case the four-year period did not commence to run until the judgment became final in April 1990. Accordingly, the present action under the UFTA, filed in April 1993, was timely under the four-year provision and summary judgment should not have been granted on this basis.

Since the foregoing conclusion requires reversal of the summary judgment, we do not address Cortez's claim that the later one-year statute of limitations did not begin to run until March 1993 or Cortez's estoppel claim which, in any event, was not ruled on by the trial court.

### FACTS

#### *The Underlying Action*

On September 19, 1984, Cortez filed a wrongful termination action against Telecheck Golden Gate, Inc. (Telecheck), a point-of-sale check verification company, all the shares of which were owned by the Vogts. (Cortez v. Telecheck Golden Gate, Inc. (Super. Ct. Alameda County, 1984, No. 588925-9) (hereinafter, Cortez I).) Cortez had been terminated as a general manager of Telecheck in May 1984, after moving from Colorado to California and spending less than one year on the job. His action also named as defendants William Vogt, La Touche, Ltd. (a management company for all of the Vogts' companies, also owned and controlled by Vogt), and other officers and affiliated businesses of Telecheck.

#### *Merger of Original Defendants in Cortez I*

In late 1985, before the trial in Cortez I, Telecheck and La Touche, Ltd., were merged into VMC-Telecheck, Inc. (VMC), which was incorporated on August 26, 1985.[2] William Vogt is the chairman and chief executive officer

---

[2]Two additional companies, Telecheck Colorado, Inc., and Telecheck San Diego, Inc., also were dissolved and had their operations taken over by VMC.

of VMC, which is a franchise of Telecheck Services, Inc. The Vogts are the sole shareholders of VMC.

### Notice to Cortez of Merger of Original Defendants

On December 23, 1985, a declaration notifying Cortez of the merger of Telecheck and La Touche into VMC was served on Alan C. Davis, Cortez's counsel in Cortez I. Raymond T. Nogueira, VMC's president, declared in part that since the incorporation of VMC in August 1985, the operation of "La Touche Ltd. [and] Telecheck Golden Gate . . . [were] taken over by VMC-Telecheck, Inc.," and "I was the President of La Touche Ltd. from January 1985 until . . . December, 1985."

In June 1987, Cortez filed a second amended complaint naming VMC as a defendant in Cortez I.

### VMC Sale to McDonnell Douglas

On August 14, 1987, VMC and several other entities owned or connected with the Vogts sold their assets to McDonnell Douglas Corporation for a gross price of approximately $12 million.[3]

### Notice to Cortez of VMC Sale to McDonnell Douglas

On February 18, 1988, in a deposition taken of Cortez for Cortez I, counsel for the defendants introduced Cortez and his counsel to a Mr. Greg Jones with the statement he was "the human resources manager for McDonnell Douglas Corporation, which has recently acquired some or all of the Telecheck entities." In a deposition for the present action, Cortez testified it was during this February 1988 deposition that he first "had an indication" there had been a sale of VMC and/or the Telecheck assets to McDonnell Douglas, that he recalled at the deposition "opposing counsel introduced [Jones] as a representative of McDonnell Douglas because some assets and liabilities, or a combination of both, I don't recall the exact terms, had been sold to McDonnell Douglas and he was there representing their interests," that he "arrived at no conclusion" on the matter of assets and liabilities of

---

[3]Documents produced later show the sale was not made directly to McDonnell Douglas. Rather, the sale involved a transfer to Telecheck Services, Inc., apparently a subsidiary of McDonnell Douglas, which exercised a right of first refusal in connection with a formal agreement of sale between the sellers (the Vogts and the named entities to be sold) and the original buyer, Telecheck Acquisition Company.

VMC and/or the Telecheck entities having been transferred to McDonnell Douglas, and that he did not know "what BBV is."[4]

So far as the record shows, the first direct notice to Cortez of the 1987 sale of VMC to McDonnell Douglas occurred in a March 1993 debtor's examination of William Vogt in connection with the underlying action.[5]

### Judgment Against Telecheck and La Touche, Ltd. in Cortez I

On July 25, 1989, a judgment of nonsuit was entered in favor of William Vogt individually in Cortez I.

On November 7, 1989, a judgment was entered after a jury trial, awarding Cortez approximately $93,000 in his wrongful termination action against Telecheck and La Touche, Ltd. only.

On November 15, 1989, Telecheck and La Touche, Ltd. filed a notice of appeal from the judgment.

---

[4]On the last two points, Cortez's July 12, 1993, deposition testimony in the present case was:

"Q. Am I correct that the presence of the gentleman from McDonnell Douglas at your deposition led you to conclude that McDonnell Douglas had acquired assets and liabilities of VMC and/or some of the Telecheck entities?

"A. I think what was said was that McDonnell Douglas had acquired some or all of the companies involved, whatever that included.

"Q. You made reference a moment ago to assets and liabilities. Was that part of the impression that you came away with?

"A. I don't know if those terms were used specifically or if the terms companies were used or entities were used. My impression was that they had purchased the various companies that Telecheck was involved with under Bill Vogt.

"Q. And whether or not the actual terms were used or not, did you arrive at the impression or the conclusion that the assets and liabilities of VMC and/or the Telecheck entities had been transferred to McDonnell Douglas?

"A. I arrived at no conclusion.

"Q. Do you know what BBV is?

"A. No, I do not."

[5]In the summary judgment proceedings here under consideration, William Vogt declared that during a recess in the trial of Cortez I in 1989, he approached Cortez and told him "that all of the remaining defendant corporations (*i.e.*, Telecheck and La Touche) had been dissolved, and that any judgment Mr. Cortez obtained against those now-defunct corporations would be meaningless."

In his declaration in opposition to the summary judgment motion, Cortez denies he had any "conversations with William Vogt either during or after the trial in the underlying action in which he has said anything to me about my ability to collect on my judgment in the underlying action against Telecheck Golden Gate, Inc., and La Touche, Ltd."

Carefully read, Cortez's declaration does not deny that Vogt spoke to him and told him that Telecheck and La Touche, Ltd. had been dissolved.

Neither the declaration of William Vogt nor that of Cortez states that William Vogt informed Cortez that VMC's assets had been sold to McDonnell Douglas.

On April 12, 1990, the Court of Appeal dismissed the appeal of Telecheck and La Touche, Ltd., for their having failed to procure the record on appeal within the time limits allowed or any extensions, and for their having failed to apply for relief from default. Thus, the judgment against Telecheck and La Touche became final.

### Cortez's Efforts to Locate Assets

In December 1989, after the judgment in Cortez I, Cortez's attorney's office contacted the Secretary of State by telephone and was told that in 1985 Telecheck and La Touche, Ltd. had merged into VMC. The attorney was also told that in 1987 VMC had changed its name to BBV Liquidating Co.

In March 1990, an investigator for Cortez's attorney issued a California and Nevada asset search report on BBV Liquidating Co., VMC and the judgment debtor companies. The investigator confirmed the information from the Secretary of State about the merger of Telecheck into VMC and reported there were insufficient assets of the two judgment debtor companies or their successors to satisfy the judgment. Only one checking account averaging in the medium four-figure range was found for BBV Liquidating Co.

The March 1990 investigator's report noted the merger on November 27, 1985, of Telecheck Golden Gate, Inc., with VMC Telecheck, Inc., and the latter's August 14, 1987, change of its corporate name to BBV Liquidating Co. The report further noted that La Touche, Ltd. had on December 2, 1985, also merged with VMC Telecheck, Inc., which later merged with BBV Liquidating Co. The report stated that there apparently were a number of companies operating throughout California with the name Telecheck or variations of that name, and that a specialized investigation would be required to determine whether any of them related to BBV Liquidating Co.

In January 1991, the same investigator issued a report on assets of the Vogts.

In August 1991, Cortez's attorney learned by telephone from the Secretary of State that the successor company, BBV Liquidating, Inc., was not in good standing and had been suspended for failure to comply with the requirements of the Franchise Tax Board.

In January 1992, Cortez's attorney received additional asset reports on the above mentioned companies and the Vogts, with essentially the same results

as the earlier reports. Except for one parcel of real property and one bank account held by the Vogts, no assets were found. The report includes the following statements:

"Please note that sources report that the corporation VMC Telecheck, Inc. may no longer be operating in San Diego and that it is a branch of Telecheck Services, Inc. of Englewood, Colorado, which appears to be a subsidiary of McDonnell Douglas Corporation of St. Louis, Missouri. Sources pursuing Telecheck Services, Inc. report that there does not appear to be any connection between this entity and the Subject Companies related to the Vogts.

". . . . . . . . . . . . . . . . . . . . . . . . .

"Upon review of our file compilation, it is the recommendation of our directors that a more extensive investigation would, in all probability, confirm the contents of this report and disclose no additional substantial forms of assets relating to the Subject. If, however, you suspect that the Subject does have assets worth pursuing, a more extensive investigation will be required."

In March 1993, a debtor examination of William Vogt for the first time directly confirmed the merger information, as well as the sale to McDonnell Douglas, as above described. William Vogt further indicated that certain liabilities, including liability to Cortez, were not transferred to McDonnell Douglas, but was specifically retained by VMC.

### The Ruling Under Review

Cortez's April 30, 1993, complaint against the Vogts alleged causes of action (1) to set aside the McDonnell Douglas transfer as a fraudulent transfer, and (2) for conspiracy to engage in a fraudulent transfer. Cortez sought to set aside the consideration received by the Vogts from the McDonnell Douglas transfer to the extent of approximately $128,000 compensatory damages. Cortez's complaint also sought punitive damages, an attachment against the Vogts' property, an accounting, and other equitable relief.

In October 1993, the Vogts filed a motion for summary judgment, which was denied on November 30. The court's November 30, 1993, order stated: "[The] motion for summary judgment is denied pursuant to *Hoover* v. *Galbraith* 7 Cal. 3d 519 [102 Cal.Rptr. 733, 498 P.2d 981] (1972) which held that an action on a judgment may not be commenced until the judgment has become final or appeal has been completed. [Cortez] had four years to commence the present action from April 1990."

On April 11, 1994, Cortez moved for summary adjudication of the statute of limitations defense in his favor. In the meantime the Vogts moved for judgment on the pleadings, based on Cortez's failure to file his complaint within the limitations period provided by the UFTA.

The trial court denied Cortez's motion for summary adjudication, and ordered the parties to appear on May 20, 1994, to show cause why the court should not vacate its previous order denying summary judgment to the Vogts.

On May 24, 1994, after the hearing on the order to show cause, the court issued an order vacating its November 30, 1993, order denying the Vogts' summary judgment motion, and entered an order granting summary judgment to the Vogts. The court ruled: ". . . The Court finds that [the] complaint is barred by the statute of limitations period set forth in Civil Code [section] 3439.09. The complaint in this action was filed on April 30, 1993. The alleged fraudulent transfer occurred on or about August 1987. [Cortez] failed to file his complaint within four years from this date. Further, the Court finds as a matter of law that [Cortez] knew or reasonably could have discovered this transfer on February 18, 1988. [Cortez] failed to file his complaint within one year from this date. See deposition of Manuel Cortez taken July 12, 1993. This ruling disposes of the action in its entirety. Accordingly, all pending motions in this matter are off calendar as moot. . . ."

On June 16, 1994, the court entered judgment in favor of the Vogts.

DISCUSSION

I

*Review of the Summary Judgment Motion*

In deciding this case, we apply the following rules:

"Summary judgment is a drastic measure that deprives the losing party of a trial on the merits. *(Mann* v. *Cracchiolo* (1985) 38 Cal.3d 18, 35 [210 Cal.Rptr. 762, 694 P.2d 1134].) It should therefore be used with caution, so that it does not become a substitute for trial. *(Rowland* v. *Christian* (1968) 69 Cal.2d 108, 111 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].) The affidavits of the moving party should be strictly construed, and those of the opponent liberally construed. *(Stationers Corp.* v. *Dun & Bradstreet* (1965) 62 Cal.2d 412, 417 [42 Cal.Rptr. 449, 398 P.2d 785].) Any doubts as to the

propriety of granting the motion should be resolved in favor of the party opposing the motion. (*Slobojan* v. *Western Travelers Life Ins. Co.* (1969) 70 Cal.2d 432, 437 [74 Cal.Rptr. 895, 450 P.2d 271].)

"A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail. (*Stationers Corp.* v. *Dun & Bradstreet, supra,* 62 Cal.2d at p. 417.) To succeed, the defendant must conclusively negate a necessary element of the plaintiff's case, and demonstrate that under no hypothesis is there a material issue of fact that requires the process of a trial. (*Ibid.*)" (*Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].)

■ Moreover, "after examining the facts before the trial judge on a summary judgment motion, we independently determine their effect as a matter of law. [Citation.]" (*California Aviation, Inc.* v. *Leeds* (1991) 233 Cal.App.3d 724, 731 [284 Cal.Rptr. 687].)

II

*The Statute of Limitations Under the UFTA*[6]

Under section 3439.09, the statute of limitations for an action for relief from a transfer proscribed under section 3439.04, subdivision (a) (transfer made[7] with intent to defraud creditor), is four years after the transfer or, if later, one year after the transfer was or could reasonably have been discovered by the claimant (§ 3439.09, subd. (a)); and the statute for an action for relief from a transfer proscribed by section 3439.04, subdivision (b) (transfer without receiving reasonably equivalent value and leaving debtor with unreasonably small assets), or section 3439.05 (transfer without receiving reasonably equivalent value and leaving debtor insolvent) is four years after the transfer. (§ 3439.09, subd. (b).)

Subdivision (c) of section 3439.09 provides that notwithstanding any other provision of law, a cause of action with respect to a fraudulent transfer

[6]To a large extent in this and the following portions of the opinion, we set forth the description of the UFTA as made recently in *Monastra* v. *Konica Business Machines, U.S.A., Inc.* (1996) 43 Cal.App.4th 1628 [51 Cal.Rptr.2d 528] (*Monastra*), at pages 1635-1636 and 1645. For consistency of form with the remainder of this opinion, we do not quote this material, which we also have edited to add certain statutory provisions.

*Monastra* involved challenged transfers occurring on July 12, 1990, with the creditor first learning of them on September 18, 1992, and filing his action on July 15, 1993, which the court held to be well within all of the applicable statutes of limitation. (*Monastra, supra,* 43 Cal.App.4th at pp. 1645-1646.)

[7]We refer only to a "transfer" made even though the sections also cover an "obligation" incurred.

is extinguished if no action is brought or levy made within seven years after the transfer was made.

In its entirety, section 3439.09 reads:

"A cause of action with respect to a fraudulent transfer or obligation under this chapter is extinguished unless action is brought pursuant to subdivision (a) of Section 3439.07 or levy made as provided in subdivision (b) or (c) of Section 3439.07[8]

"(a) Under subdivision (a) of Section 3439.04, within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant.

"(b) Under subdivision (b) of Section 3439.04 or Section 3439.05, within four years after the transfer was made or the obligation was incurred.

"(c) Notwithstanding any other provision of law, a cause of action with respect to a fraudulent transfer or obligation is extinguished if no action is brought or levy made within seven years after the transfer was made or the obligation was incurred."

---

[8]Section 3439.07 spells out remedies available to a creditor, and provides in subdivisions (a), (b) and (c):

"(a) In an action for relief against a transfer or obligation under this chapter, a creditor, subject to the limitations in Section 3439.08, may obtain:

"(1) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim.

"(2) An attachment or other provisional remedy against the asset transferred or its proceeds in accordance with the procedures described in Title 6.5 (commencing with Section 481.010) of Part 2 of the Code of Civil Procedure.

"(3) Subject to applicable principles of equity and in accordance with applicable rules of civil procedure, the following:

"(A) An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or its proceeds.

"(B) Appointment of a receiver to take charge of the asset transferred or its proceeds.

"(C) Any other relief the circumstances may require.

"(b) If a creditor has commenced an action on a claim against the debtor, the creditor may attach the asset transferred or its proceeds if the remedy of attachment is available in the action under applicable law and the property is subject to attachment in the hands of the transferee under applicable law.

"(c) If a creditor has obtained a judgment on a claim against the debtor, the creditor may levy execution on the asset transferred or its proceeds. . . ."

*Summary of UFTA (§§ 3439-3439.12)*

A transfer of assets made by a debtor is fraudulent as to a creditor, whether the creditor's claim[9] arose before or after the transfer, if the debtor made the transfer (1) with an actual intent to hinder, delay or defraud any creditor, or (2) without receiving reasonably equivalent value in return, and either (a) was engaged in or about to engage in a business or transaction for which the debtor's assets were unreasonably small, or (b) intended to, or reasonably believed, or reasonably should have believed, that he or she would incur debts beyond his or her ability to pay as they became due. (§ 3439.04[10]; *Reddy* v. *Gonzalez* (1992) 8 Cal.App.4th 118, 122-123 [10 Cal.Rptr.2d 55].)

A transfer by a debtor is fraudulent as to creditors whose claims arose before the transfer if the debtor made the transfer (1) without receiving reasonably equivalent value in exchange, and (2) either (a) was insolvent at the time of the transfer, or (b) became insolvent as a result of the transfer. (§ 3439.05.[11])

A creditor who is damaged by a transfer described in either section 3439.04 or section 3439.05 can set the transfer aside or seek other appropriate relief under section 3439.07. A transfer that would otherwise be voidable as intentionally fraudulent under section 3439.04, subdivision (a), is not

---

[9]Pertinent definitions in section 3439.01 include the following:

"(b) 'Claim' means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.

"(c) 'Creditor' means a person who has a claim . . . .

"(d) 'Debt' means liability on a claim.

"(e) 'Debtor' means a person who is liable on a claim."

[10]Section 3439.04 provides:

"A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:

"(a) With actual intent to hinder, delay, or defraud any creditor of the debtor.

"(b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

"(1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

"(2) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due."

[11]Section 3439.05 provides: "A transfer or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."

voidable against a transferee who took in good faith and for a reasonably equivalent value. (§ 3439.08, subd. (a).)

Section 3439.10 provides: "Unless displaced by the provisions of this chapter, the principles of law and equity, including the law merchant and the law relating to principal and agent, estoppel, laches, fraud, misrepresentation, duress, coercion, mistake, insolvency, or other validating or invalidating cause, supplement its provisions."

Section 3439.11 requires that the UFTA "be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among the states enacting it."

## III

### *Summary of Limitations Issue and Its Resolution*

■ There are no cases in California dealing with the specific issue here, involving when the statute of limitations begins to run under the UFTA. That is, no California case construing the UFTA determines whether, when a transfer alleged to be a fraudulent conveyance occurs during an underlying action which later establishes by final judgment the actual legal existence of a debtor-creditor relationship, the limitations period runs from the date of the transfer as distinguished from the date the underlying judgment becomes final.

The language of section 3439.09 appears to be straightforward in its reference to the time "the transfer was made or the obligation was incurred." However, legislative material published in connection with the adoption of the UFTA requires a conclusion a creditor has an option to establish creditor status by judgment and thus cause the limitations period to run from the time the underlying judgment becomes final.

As demonstrated in the following discussion, the remedies of the UFTA and its predecessor, the Uniform Fraudulent Conveyance Act, are cumulative to the remedies applicable to fraudulent conveyances that existed before the uniform laws went into effect. As to the preexisting remedies, the California Supreme Court has held that the limitations period begins to run at the time of judgment in the underlying action, but if the creditor is unaware of the fraudulent conveyance, the limitations period begins to run when the creditor discovers the fraudulent conveyance. (*Adams v. Bell* (1936) 5 Cal.2d 697, 703 [56 P.2d 208], applying Code Civ. Proc., § 338, former subd. 4 [now subd. (d)].)

In light of the carry-over of remedies from even before the Uniform Fraudulent Conveyance Act, the consistency of the *Adams* v. *Bell* rule with the legislative history on the UFTA, and the salutary purposes served by obviating the need for a second lawsuit while the underlying action is being pursued, we conclude the *Adams* v. *Bell* rule of accrual at the time of the underlying judgment or later discovery applies.

### Legislative and Decisional Background Making Lawsuit Optional, Rather Than Required

Legislative and decisional history of the UFTA makes clear its remedies are cumulative to preexisting remedies for fraudulent conveyances. A key feature of the UFTA is that a creditor is permitted, but not required, to maintain an action to annul a fraudulent conveyance before his debt has matured. (See *Estate of Kalt* (1940) 16 Cal.2d 807, 811 [108 P.2d 401, 133 A.L.R. 1424].[12]) As stated in *Weisenburg* v. *Cragholm* (1971) 5 Cal.3d 892, 896 [97 Cal.Rptr. 862, 489 P.2d 1126], "it is no longer necessary that a creditor reduce his claim to judgment before seeking the benefit of the remedy. (See *Rupp* v. *Kahn*, 246 Cal.App.2d 188 [55 Cal.Rptr. 108].)"

Concerning the general import of the UFTA, 1 Glenn, Fraudulent Conveyances and Preferences, *supra*, section 77, page 130, cited in Assembly Comment (6) to section 3439.07,[13] states: "§ 77. The Uniform Law, However, Does Not Confine the Creditor to Its Method.

"By its very terms, the statute gives him an option. He may 'reject the aid of equity, and levy attachment or execution at law as he might before the

---

[12]"Under the law of California at the time of the renunciations under consideration, every transfer of property made with intent to hinder, delay or defraud a creditor of the transferor was fraudulent and could be set aside or disregarded by such creditor (Civ. Code, sec. 3439) *provided he had a specific lien on the property or had prosecuted his claim to judgment.* (Civ. Code, sec. 3441, now repealed; *Moore* v. *Schneider*, 196 Cal. 380 [238 P. 81]; *Thomas* v. *Lavery*, 126 Cal.App. 787 [14 P.2d 160].) *Under the Uniform Fraudulent Conveyance Act now in force* in this state *no judgment or lien is necessary.* (Civ. Code, secs. 3439, 3440.5, repealing Civ. Code, sec. 3441; Glenn, Fraudulent Conveyances [Revised ed.], sec. 76.)" (*Estate of Kalt, supra,* 16 Cal.2d at p. 811, italics added.)

The publication by Glenn, cited in *Kalt*, at section 76 bears the heading, "The Uniform Law Does Not Require That the Creditor Have Judgment, Regardless Whether He Is a 'Present' Creditor, or 'Subsequent,'" and cites authorities from other states universally accepting the proposition that the Uniform Law dispenses with the requirement that the creditor be armed with judgment or attachment. (1 Glenn, Fraudulent Conveyances and Preferences (1940 ed.) § 76, pp. 128-129.)

[13]In 1986, when California replaced the 1939 Uniform Fraudulent Conveyance Act (Stats. 1939, ch. 329, § 2, p. 1667) with the UFTA (Stats. 1986, ch. 383, § 1, p. 1589), the Assembly published the comments of the National Conference of Commissioners on Uniform State Laws (Comments) in connection with the sections adopted. (86 Assem. J. 8569 (1985-1986

statute.' Or he 'may seek the aid of equity, and without attachment or execution, may establish his debt, whether matured or unmatured, and challenge the conveyance in the compass of a single suit.' But the creditor's choice goes further because *the Uniform Law does not forbid his seeking the older remedy of judgment, followed by judgment creditor's suit*, or the rights that he may gain by virtue of an attachment." (Fns. omitted, italics added.)

In *Rupp* v. *Kahn, supra*, 246 Cal.App.2d at page 197, this state of the law is described as follows: ". . . [T]he *California law originally permitted proceedings* by way of creditors' bills to attack fraudulent conveyances *only where the plaintiff had a specific lien on the property or had reduced his claim to judgment. But* under section 3439.09 of the Civil Code, as that section *now* reads, it is sufficient that the claims have matured. [Citations.] [¶] In fact *even the holder of an unmatured claim may*, under section 3439.10 of the Civil Code, *bring an action for protective relief.*" (Fn. omitted, italics added.)

Thus it is clear the main thrust of the UFTA, as with the Uniform Fraudulent Conveyance Act, is that the act permits, but does not require, a creditor to bring suit to set aside a fraudulent transfer before the claim has matured. Under this scheme of law the question arises: If a party asserting creditor status in a pending action is not required under the UFTA to file suit to set aside an alleged fraudulent transfer until the creditor obtains a final judgment, under what circumstances, and when, does the prescribed limitations period for bringing the attack on the transfer begin to run?

In our view, the fact that the creditor may pursue the unmatured claim to judgment, followed by a suit to set aside the fraudulent transfer, suggests it would be inappropriate to begin the running of the limitations period for the fraudulent transfer action before the creditor choosing to pursue a judgment actually obtains the judgment.

Fortifying this view and showing the importance of the underlying judgment is the holding of *Weisenburg* v. *Cragholm, supra*, 5 Cal.3d at pages 896-897, that where there is a reversal of the underlying judgment on which the plaintiff relies to bring his action as a creditor to set aside the fraudulent transfer, the creditor is no longer entitled to the latter remedy. The Supreme Court states: ". . . [S]ince plaintiff is not entitled to the remedy unless he has shown that he is a creditor of the [debtors], and the basis for the finding that he was such a creditor has been eliminated [by reversal of the underlying judgment], reversal of the judgment [setting aside fraudulent transfers] is required." (*Ibid.*)

Reg. Sess.); 12 West's Ann. Civ. Code (1970 ed., 1997 pocket supp.) § 3439 et seq., p. 184 et seq.; 7A U. Laws Ann. (1985) Fraudulent Transfer Act, § 1, p. 645 et seq.)

It is well established that such reports are part of the legislative history and may be considered when the meaning of a statute is uncertain. (*People* v. *Cruz* (1996) 13 Cal.4th 764, 773, fn. 5 [55 Cal.Rptr.2d 117, 919 P.2d 731].)

If the limitations period on the fraudulent transfer action begins to run before final judgment in the underlying creditor action, the creditor may be required to file and prosecute both actions to protect against the expiration of the limitations period; if the creditor action is not successful the fraudulent transfer action will be dismissed or severed and will have resulted in needless effort and expense to both parties and the court.

### California Used Time of Underlying Judgment to Start Limitation Period Before the Uniform Fraudulent Conveyance Act

· Under the law before the Uniform Fraudulent Conveyance Act, a creditor alleging a fraudulent conveyance was entitled to the benefit of a limitations period that began to run when judgment on the underlying debt became final. (*Adams* v. *Bell, supra,* 5 Cal.2d at p. 703.)

*Adams* v. *Bell* is a factually analogous case in that the alleged fraudulent conveyance occurred during the pendency of the underlying action establishing the debtor's liability to the creditor, and the action to set aside the conveyance was brought well beyond the applicable three-year limitation period after the transfer (as well as more than three years after the judgment establishing the underlying liability). (*Adams* v. *Bell, supra,* 5 Cal.2d at p. 700.) The transfer during the underlying action (commenced in 1929) was in April 1930, after which a money judgment was entered in July 1930. (*Id.* at pp. 700, 701.) More than three years later, in May 1934, the creditor brought the present action to set aside the transfer.[14] (5 Cal.2d at p. 700.)

Applying Code of Civil Procedure section 338, former subdivision 4,[15] the court states, ". . . ordinarily one asserting that a conveyance is fraudulent must show that he was a creditor of the debtor at the time of transfer [citation], [but] it is not necessary that the claim at said time be reduced to judgment." (*Adams* v. *Bell, supra,* 5 Cal.2d at p. 701.) Later, upholding the

---

[14]In *Adams* v. *Bell, supra,* 5 Cal.2d at page 700, it was alleged the conveyance in question was made for the purpose of defeating recovery by the plaintiff of her judgment.

The action was brought under former sections 3439 and 3442 (enacted in 1872 and repealed with the enactment of the Uniform Fraudulent Conveyances Act by Stats. 1939, ch. 329, § 1, p. 1667), which provided in part:

"Every transfer of property or charge thereon made, every obligation incurred, and every judicial proceeding taken, with intent to delay or defraud any creditor or other person of his demands, is void against all creditors of the debtor . . . ." (Former § 3439.)

"The question of fraudulent intent is one of fact, and not of law[.]" (Former § 3442.)

[15]Former subdivision 4 of Code of Civil Procedure section 338, applied in *Adams* v. *Bell, supra,* 5 Cal.2d at page 703, provided a three-year period for the commencement of "(4) An action for relief on the ground of fraud or mistake. The cause of action in such a case not be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." (See now Code Civ. Proc., § 338, subd. (d), providing substantially identical language.)

trial court's conclusion the action was not barred and discussing the three-year limitations period, the court states: ". . . *Ordinarily, such cause of action* [to set aside a fraudulent conveyance] *would accrue on date of judgment* but it has been held that if the creditor knows nothing about the fraudulent conveyance, the cause (in the absence of laches) does not arise until he discovers the fraud by which his rights have been invaded. [Citations.] Plaintiff states that the facts on which this case is founded were not disclosed to her until return of the execution unsatisfied. True, she failed to allege the circumstances surrounding discovery of the fraud, but this defect in the pleading [citation] evidently escaped the notice of appellants." (*Adams v. Bell, supra*, 5 Cal.2d at p. 703, italics added.)

In *Richardson* v. *Michel* (1941) 45 Cal.App.2d 188, 196 [113 P.2d 916], this court applied the following limitations rule to an action to set aside a fraudulent conveyance: "The time when the [three-year] period of limitation prescribed by section 338, subdivision 4 began to run in the instant case depends upon whether the respondent [creditor] had knowledge of the material facts with respect to the fraud at the time his judgment was entered or, if not, upon when such facts were discovered, or perhaps should have been discovered, by him. [Citations.]" (*Id.* at p. 200.)

Thus, the time of the underlying judgment, combined with the creditor's knowledge of transfer, were the key factors in determining when the statute of limitations began to run.

The three-year limitations period of Code of Civil Procedure section 338, former subdivision 4, remained applicable during the existence of the Uniform Fraudulent Conveyance Act. (*Filmservice Laboratories, Inc.* v. *Harvey Bernhard Enterprises, Inc.* (1989) 208 Cal.App.3d 1297, 1309 [256 Cal.Rptr. 735]; *Gould* v. *Fuller* (1967) 249 Cal.App.2d 18, 32 [57 Cal.Rptr. 23].)

*UFTA Comments Suggest the Remedies Under the Uniform Fraudulent Conveyance Act Carry Over to the UFTA*

The comments under the limitations provisions of section 3439.09 primarily point out the section is new and intended to make clear that lapse of the statutory period bars the right and not merely the remedy. It is noted that before adoption of this provision the statutes of limitation among the states varied widely and were subject to uncertainty. (12 West's Ann. Civ. Code (1970 ed., 1997 pocket supp.) § 3439.09, p. 206.) Accordingly, the stated purpose of the limitations section is to establish a uniform rule having the effect of barring the right to sue under the UFTA when the applicable time period expires.

The introductory paragraph to the UFTA's limitations provisions in section 3439.09 makes repeated reference to the remedies provisions of section 3439.07.[16] The comments to the latter section state, among other things, the section is derived from sections 9 and 10 of the Uniform Fraudulent Conveyance Act, former sections 3439.09 and 3439.10. Thus, the remedies under the UFTA are a carryover of the remedies of the Uniform Fraudulent Conveyance Act.[17]

In reaching our conclusion in this case, we remain mindful of these aspects of an intent to create a uniform limitations period among the states and a carryover of Uniform Fraudulent Conveyance Act remedies. (§ 3439.11.)

### The Glenn Citation in the UFTA Comments States the Limitation Period Runs From the Date of Judgment

After stating the uniform law does not undertake "to establish an exclusive method of setting aside a fraudulent conveyance," Glenn states with respect to "a creditor who chooses to sue his debt to judgment and then attack the fraudulent conveyance," that: "The remedy such statutes afford is cumulative merely; and, since the creditor has an option to resort to the old procedure, he should not be penalized if he makes that his choice. *It follows that if the creditor sues his debt to judgment in ordinary fashion, his time for a later suit to set aside a fraudulent conveyance will run from the date of the judgment.*" (1 Glenn, Fraudulent Conveyances and Preferences, *supra*, § 88, p. 150, italics added, fns. omitted.)

Under this legislatively referenced view, it is abundantly clear that in the present case the limitation period would not begin to run until the underlying judgment in Cortez I became final in April 1990, thus making timely this April 1993 action to set aside the August 1987 fraudulent conveyance.

---

[16]"A cause of action . . . is extinguished unless action is brought pursuant to *subdivision (a) of Section 3439.07* or levy made as provided in *subdivision (b) or (c)* of Section *3439.07*: . . ." (§ 3439.09, italics added.)

[17]Comment (6) to present section 3439.07 states:

"(6) The remedies specified in this section, like those enumerated in Sections 9 and 10 of the Uniform Fraudulent Conveyance Act, are cumulative. Lind v. O.N. Johnson Co., 204 Minn. 30, 40, 282 N.W. 661, 667 [119 A.L.R. 940], (1939) (Uniform Fraudulent Conveyance Act held not to impair or limit availability of the 'old practice' of obtaining judgment and execution returned unsatisfied before proceeding in equity to set aside a transfer); Conemaugh Iron Works Co. v. Delano Coal Co., Inc., 298 Pa. 182, 186, 148 A. 94, 96 (1929) (Uniform Fraudulent Conveyance Act held to give an 'additional optional remedy' and not to 'deprive a creditor of the right, as formerly, to work out his remedy at law'); 1 G. Glenn, Fraudulent Conveyances and Preference 120, 130, 150 (Rev. ed. 1940). [86 A.J. 8569]." (Legis. Committee Com., 12 West's Ann. Civ. Code (1970 ed., 1997 pocket supp.) § 3439.07, pp. 200-201.)

*Other States and Minnesota Apply a Statute of Limitations Running From the Time of Judgment in the Underlying Action*

The last quotation from Glenn's publication is from the concluding paragraph of section 88 of his work. In section 88, on the immediately preceding page, Glenn cites authorities from six states for the proposition that, under the law before the Uniform Fraudulent Conveyance Act, the "starting point is the date when the creditor obtained his judgment; so all the cases agree."[18]

In *Lind* v. *O.N. Johnson Co.* (1938) 204 Minn. 30 [282 N.W. 661, 666, 119 A.L.R. 940] (*Lind*), cited both in comment (6) to section 3439.07 and in the Glenn publication, the court construed UFTA's predecessor, the Uniform Fraudulent Conveyance Act.[19] *Lind* held a six-year statute of limitations did not bar the use of the act to set aside a transfer that occurred nine years earlier in June 1928, where the creditor brought the underlying action in November 1928 establishing the debtor's liability to the creditor by a judgment entered in 1932. In 1937 the creditor brought the action to set aside the transfer as a fraudulent conveyance.[20] (*Lind, supra,* 282 N.W. at pp. 663, 666-669.[21])

---

[18]Glenn cites: *Montgomery Iron Works* v. *Capital City Co.* (1903) 137 Ala. 134 [34 So. 210]; *Weaver* v. *Haviland* (1894) 142 N.Y. 534 [37 N.E. 641]; *Ainsworth* v. *Roubal* (1905) 72 Neb. 723 [105 N.W. 248]; *Rounds* v. *Green* (1882) 29 Minn. 139 [12 N.W. 454]; *Ziska* v. *Ziska* (1908) 20 Okla. 634 [95 P. 254]; and *Williams* v. *Commercial Nat. Bank* (1907) 49 Or. 492 [90 p. 1012]. (1 Glenn, Fraudulent Conveyances and Preferences, *supra,* § 76, p. 149, fn. 84.)

The list of jurisdictions starting the limitations period at the time of the underlying judgment can be augmented (without any pretense of being complete or exhaustive) to include jurisdictions such as Colorado (*Greco* v. *Pullara* (1968) 166 Colo. 465 [444 P.2d 383] [where, as here, the creditor had no actual notice of the transfer before becoming a judgment creditor (see *Sands* v. *New Age Family Partnership* (Colo.App. 1995) 897 P.2d 917, 920)]; and the Fifth, Eighth and Tenth Circuit Courts of Appeals construing state statutes (*Douglas-Guardian Warehouse Corporation* v. *Jones* (5th Cir. 1969) 405 F.2d 427; *Keaton* v. *Little* (10th Cir. 1929) 34 F.2d 396; *Dykes* v. *Little* (8th Cir. 1928) 31 F.2d 742).

[19]The statute in question defined a "creditor" as "a person having a claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed, or contingent." (Mason Minn. St. 1927, § 8475; *Lind* v. *O.N. Johnson Co., supra,* 282 N.W. at p. 666.) In *Lind,* the statute in question provided that a creditor whose claim has matured may have a fraudulent conveyance (or transfer) set aside to the extent necessary to satisfy his claim or he may disregard the conveyance and levy or attach the property. (Mason Minn. St. 1927, § 8483.)

[20]The 1937 action in *Lind* to set aside a fraudulent conveyance also attacked a transfer made in 1931, within the six-year limitations period. (*Lind, supra,* 282 N.W. at pp. 663, 666-669.)

[21]*Lind* framed the question, "[W]hen plaintiff brought his action against Johnson in November, 1928, he could have maintained suit also against the transferees of the stock, since the transfers were made June 30, 1928. But was he compelled to assert this method as his only remedy and right to relief under penalty of having the six year statute of limitations, 2 Mason Minn.St.1927, § 9191, run, or could he as he did here, proceed to judgment and execution

Consistent with California's interpretation of the Uniform Fraudulent Conveyance Act, *Lind* pointed out the act "simply abrogates 'the ancient rule whereby a judgment and a lien were essential preliminaries to equitable relief against a fraudulent conveyance.' . . . So it seems clear that the meaning of the statute is that a creditor without a judgment can sue to set aside a fraudulent conveyance." (*Lind, supra,* 282 N.W. at p. 667.) Part of *Lind*'s holding and rationale is:

". . . Why should the creditor be compelled in every case to commence suit against the grantee to set aside a transfer under penalty of having the statute of limitations run until he is certain of being one in fact? Often the asserted claim against the principal obligor might well be uncertain, and even speculative, or at least one in which the amount of recovery is very uncertain. *A construction should not be adopted compelling a creditor who claims to be such to institute proceedings of this nature until the debtor's liability has been established by final judicial determination.* It is apparent that such compulsion will exist in many cases if the creditor cannot proceed by the old method. In many cases *the third party grantee will be saved the burden of defending a suit by one whose cause of action failed against his grantor.*

"[T]his statute simply abrogates 'the ancient rule whereby a judgment and a lien were essential preliminaries to equitable relief against a fraudulent conveyance', and that what it 'seeks' is to level 'distinctions that at times had been the refuge of the dilatory debtor.' American Surety Co. v. Conner, 251 N.Y. 1, 7, 166 N.E. 783, 785, 65 A.L.R. 244. After all, the fraudulent grantor cannot complain, for as to him the obligation is a subsisting one until the statutory period has run against the judgment. As to his grantee, who holds only an apparent title, a mere cloak under which is hidden the hideous skeleton of deceit, the real owner being the scheming and shifty judgment debtor,—what reason has he to complain when the six year statute giving repose to the remedy has not expired since entry of judgment?" (*Lind, supra,* 282 N.W. at p. 668, italics added.)

---

before bringing suit to set aside the transfer?" (*Lind, supra,* 282 N.W. at p. 667.) *Lind* answered, "We think plaintiff could make an election and without penalty." (*Ibid.*)

*Lind* also states the issues it is considering are: "(1) Could plaintiff have assailed the 1928 transfer before he obtained a judgment, and if so, was he obliged to pursue such a course under penalty of the statute of limitations running from the time the transfer could first be impeached? (2) Does the [uniform] act abolish the time-honored practice of securing judgment and having execution returned unsatisfied before bringing suit to set aside a fraudulent conveyance.?" (*Lind, supra,* 282 N.W. at p. 666.)

Thus, the questions decided in *Lind* have direct bearing on the issues in the present case.

*Lind* points out the uniform act "is remedial and as such should be liberally construed," that "[t]he new act simply adds an efficient, optional, and additional remedy to a creditor who has not reduced his claim to judgment," and that the objective of the act "is to enhance and not to impair the remedies of the creditor." (*Lind, supra,* 282 N.W. at p. 667.)

### Conclusion Under Section 3439.09

In cases such as this where there is an alleged fraudulent transfer made during a pending lawsuit that will establish whether in fact, and the extent to which, a debtor-creditor relationship exists, we conclude the limitation period does not commence to run until the judgment in the underlying action becomes final. The primary bases of our conclusion are:

(a) The contemporaneous legislative adoption of the clear statements of policy and purpose of the UFTA as a cumulative and additional remedy;

(b) The requirement we implement a construction of the UFTA that is uniform with other states' laws; and

(c) The potential of unnecessary litigation if strict time limits are drawn for fraudulent transfer cases in circumstances such as are involved in the present case. We conclude the period of limitations in cases of such pending lawsuits commences to run when the judgment in the underlying action becomes final.

Accordingly, since the 1993 action here was brought well within four years after the time the judgment in the underlying action became final, the action was timely.

### IV

Because the one-year provision running from the time ". . . the transfer or obligation was or could reasonably have been discovered by the claimant" (§ 3439.09, subd. (a)) only extends the four-year statute of limitations set forth in section 3439.09, subdivision (a) under certain circumstances, and we have decided the four-year limitation period had not expired, it is unnecessary to discuss the one-year provision.

## DISPOSITION

Judgment reversed. Cortez to recover costs on appeal.

Work, Acting P. J., and McDonald, J., concurred.

A petition for a rehearing was denied March 11, 1997, and respondents' petition for review by the Supreme Court was denied April 30, 1997.