[No. G035355. Fourth Dist., Div. Three. May 10, 2006.]

Estate of ROBERTA W. MYERS, Deceased.
ALBERT O. LISSOY, Petitioner and Appellant, v.
JOE H. LEACH, Objector and Respondent.

COUNSEL

James D. White; and Donna Bader for Petitioner and Appellant.

Stephen M. Magro for Objector and Respondent.

---

OPINION

**BEDSWORTH, Acting P. J.**—Albert O. Lissoy, a creditor of the estate of Roberta W. Myers, deceased, appeals from a summary judgment disposing of his petition for an order pursuant to Probate Code section 850.[1] Lissoy's petition sought to recover profits from the sale of real property for the benefit of the estate's creditors, based upon a claim the property had previously been fraudulently conveyed by Myers. The probate court determined Lissoy's petition failed as a matter of law because: He lacked standing to pursue an order under section 850; he failed to exhaust his right to require the executor of the estate to pursue the claim under section 9653; and his claim was barred by the applicable statutes of limitations. We disagree with each of these conclusions, and therefore must reverse.

\* \* \*

As this case was decided on summary judgment, and our review is de novo, we will recite the evidence in the light most favorable to Lissoy. (*Schooler v. State of California* (2000) 85 Cal.App.4th 1004, 1008–1009 [102 Cal.Rptr.2d 343].)

Most of the facts are undisputed. Lissoy is a creditor of the estate of Roberta Myers, deceased. The estate is insolvent. Lissoy's claim against the estate was approved in the amount of $275,000, but has been satisfied only to the extent of $125,000. Myers's debt to Lissoy stems from a business transaction in which Myers and her daughter, Diana Sheppard, had purchased a bar and restaurant business from Lissoy. When the venture proved unsuccessful, Myers and Sheppard defaulted.

Lissoy subsequently filed a lawsuit, seeking money damages from both Myers and Sheppard. Both of them later declared bankruptcy, and Lissoy's lawsuit was stayed. Meanwhile, respondent Joe H. Leach became romantically involved with Sheppard in 1994, and they began living together in 1996.

---

[1] All further statutory references are to the Probate Code.

Myers was denied a discharge of the Lissoy debt in her bankruptcy proceeding. Shortly after that order was affirmed on appeal, in October of 1997, she sold her residence, located on Wellington Avenue in Santa Ana, to Leach. However, Myers continued to reside in the home, and there is evidence she (1) reimbursed Leach for his down payment; and (2) continued to pay the mortgage and all expenses associated with the Wellington residence. In May of 1998, Myers executed a holographic will, in which she directed that "my house [on] Wellington Ave., Santa Ana, CA in the name of Joe E. Leach is to be sold and any profits are to be divided among my four children . . . ."

Myers died in September of 1998, while her bankruptcy was still pending. Sheppard was appointed as personal representative of the probate estate. At the time of her death, Myers continued to reside in the Wellington property. In January of 1999, Leach entered into an agreement to sell the Wellington property, and the transaction was completed in March of 1999.

However, Myers's bankruptcy case remained active, despite her death, and Lissoy received a disbursement from the bankruptcy in November of 1999. The bankruptcy case was finally closed in January of 2000. After Lissoy learned that Myers's bankruptcy had terminated, and that she was deceased, he reactivated his civil lawsuit against her, and filed a creditor's claim in the probate matter.

Lissoy's creditor's claim was eventually settled, and his claim approved by the probate court in the reduced amount of $275,000. As part of that settlement, the claim was satisfied in part, leaving an outstanding balance of $150,000, which was entered as a judgment in the civil case in February of 2002. Sheppard acknowledged in the settlement agreement that Lissoy claimed "to have standing, as an unsatisfied creditor, to file certain actions," either within the probate proceeding or independently of it, against "third parties." Sheppard expressly declared, however, that she "does not believe these other actions have legal merit and/or are not economically feasible to pursue."

On December 17, 2003, Lissoy filed his verified petition against Leach pursuant to section 850, seeking an order requiring Leach to account for, and disgorge to the estate, the profits he had realized from his subsequent resale of the Wellington residence. That petition alleges most of the undisputed facts recited *ante*, and additionally alleges that Myers's sale of the Wellington residence to Leach had been a sham—an intentional fraudulent scheme designed to hide that asset from Myers's creditors. It specifically alleges that Leach was to hold the property as a "straw" for Myers, "in an intentional attempt to hinder, defraud and delay Lissoy in the collection of his claims

against Myers." It characterizes the transaction as a "fraudulent transfer to Leach of bare legal title to the Wellington Avenue property . . . ." The petition also alleges that Sheppard—Myers's daughter, the representative of her estate, and Leach's live-in love, was an active participant and coconspirator in the scheme.

Leach expressly denied the fraud claims, and insisted that his purchase of the Wellington property was entirely aboveboard, unconditional and legitimate. He then moved for summary judgment, arguing that Lissoy's claims (which he characterized as being for "enforcement of secret trust," "breach of secret trust" and "constructive trust") were barred by the applicable statutes of limitations.

In opposition to the summary judgment motion, Lissoy offered substantial—even compelling—evidence to support his fraudulent transfer and conspiracy allegations, consisting primarily of a lengthy declaration from another of Myers's daughters. That daughter, a mortgage broker, declared that she had personally arranged the sale of the Wellington property to Leach, at the request of both Myers and Sheppard, and that all parties, including Leach, treated the transaction as one in name only. That daughter also arranged the subsequent sale of the Wellington property from Leach to a third party, and explained that Leach acted as essentially a "straw man" in that transaction as well, with his involvement limited to merely signing the documents.

The daughter also declared that all three of Sheppard's siblings, herself included, had demanded in writing that Sheppard pursue Leach on behalf of Myers's estate for the profits he had realized from the sale of the Wellington property. Sheppard ignored them.

In reply, Leach argued, for the first time, that Lissoy had no remedy at all under section 850, and that his only remedy was to make a demand under section 9653 that Sheppard pursue a claim against Leach on behalf of the probate estate.

On the date scheduled for the hearing, Lissoy objected to Leach's introduction of a new legal argument in the reply brief, and requested additional time to respond. The court granted the request, and gave both sides an additional opportunity to brief the issues raised in the reply brief.

On the continued oral argument date, Lissoy offered the court newly discovered evidence suggesting that Sheppard and Leach were actually married, and were holding title to their own residence as "husband and wife." After hearing oral argument, the court took the matter under submission, and subsequently granted judgment in favor of Leach.

In its decision, the court reasoned that without regard to the merits of Lissoy's claim, it had accrued no later than December 5, 2000, when Lissoy learned that Leach had repudiated any supposed obligation to hold the Wellington property or its proceeds in trust for the benefit of Myers. Since Lissoy did not file his petition until December 17, 2003, his claim was barred under either a two-year (breach of oral trust agreement) or a three-year (fraudulent conveyance) statute of limitations.

The court further concluded that Lissoy was precluded from bringing any direct claims against Leach until he had "exhaust[ed] his remedy under . . . section 9653 to seek an order directing the personal representative of the estate of Roberta W. Myers, Deceased, to pursue an alleged claim of a fraudulent conveyance made by the Decedent." Finally, the court concluded that Lissoy lacked standing to seek an order under section 850 in any event, as he was not claiming any direct ownership interest in the Wellington property.

In the course of its ruling, the court dismissed as "not relevant" all evidence suggesting that (1) Sheppard was a coconspirator in the fraudulent scheme to deprive Myers's creditors of the proceeds of the Wellington property; and (2) Sheppard had a conflict of interest which precluded her, in her capacity as estate representative, from pursuing a claim for fraudulent conveyance against Leach. The court said none of that evidence created a triable issue of fact regarding the applicable statutes of limitations, and requiring Lissoy to make a demand of the personal representative of the Myers's estate to pursue a claim against Leach would be an "idle act" only if *Leach himself* were the personal representative.

## I

First, we conclude Lissoy's petition asserted a claim for fraudulent conveyance, and nothing else. Leach's attempt to characterize it as a petition for "enforcement of a secret trust" or as seeking damages of "breach of secret trust" is unpersuasive. Although Lissoy did allege that Myers and Leach had entered into an agreement under which Leach would hold the Wellington property in "secret trust" for Myers, he was hardly seeking to enforce that agreement. The petition clearly establishes that the purpose of that trust was to defraud Myers's creditors, and in particular Lissoy himself. Consequently, the alleged secret trust was the sine qua non of the fraudulent scheme. Lissoy was a *victim* of that alleged scheme, not its beneficiary.

Rather than seeking to enforce the alleged agreement between Myers and Leach—which Lissoy expressly characterized as a "fraud" designed to "hinder defraud and delay" Myers's creditors—he sought instead to unravel

its effects and force Leach to disgorge the illegal profits he had obtained through his direct participation in it—all for the benefit of Myers's creditors. That is a classic fraudulent conveyance claim.

Moreover, as Leach essentially concedes, the statute of limitations on that common law fraudulent conveyance claim did not commence running until Lissoy had obtained a *final judgment* against Myers in the underlying action. (*Adams v. Bell* (1936) 5 Cal.2d 697 [56 P.2d 208]; *Cortez v. Vogt* (1997) 52 Cal.App.4th 917 [60 Cal.Rptr.2d 841]; *Macedo v. Bosio* (2001) 86 Cal.App.4th 1044 [104 Cal.Rptr.2d 1].) That did not occur until April 22, 2002. Lissoy's claim, then, could be filed any time within three years of that date. Consequently, his petition, if otherwise sufficient to state that claim, was timely.

## II

The second question we face is whether Lissoy had standing to pursue that claim via a petition for order under section 850. The answer is yes.

■ Section 850 provides in pertinent part that the "personal representative or any interested person" is permitted to file a petition requesting that the court make an order in certain cases, including: (1) "Where the decedent died in possession of, or holding title to, real or personal property, and the property or some interest therein is claimed to belong to another;" and (2) "Where the decedent died having a claim to real or personal property, title to or possession of which is held by another." (§ 850, subd. (a)(2)(C) & (D).) This provision is intended to operate as a mechanism for pursuing "claims, causes of action, or matters that are normally raised in a civil action to the extent that the matters are related factually to the subject matter of a petition filed under this part." (§ 855.)

■ On its face, section 850 certainly appears to apply to the type of dispute presented in Lissoy's petition. Lissoy offered substantial evidence demonstrating that at the time of Myers's death, she was in possession of the Wellington property, which Leach claims to own. Moreover, there was also evidence that Myers, who purported to direct the disposition of the Wellington property in her will (after acknowledging that title was held by Leach), claimed at least a beneficial interest in the property, title to which was held by Leach, at the time of her death. For purposes of summary judgment, we must presume those facts to be true, and they bring this dispute squarely within both of the quoted provisions of section 850.

Additionally, the Probate Code defines an "interested person" as including "[a]n heir, devisee, child, spouse, *creditor*, beneficiary, and any other person having a property right in or claim against a trust estate or the estate of a

decedent which may be affected by the proceeding." (§ 48.) Thus Lissoy, as a creditor of Myers's estate, presumptively qualifies to initiate a proceeding under section 850.[2]

And finally, the authorities cited by Leach, concluding that only one who claims an ownership interest in the disputed property would have standing under section 850, are inapposite, as they are based upon former section 851.5, the predecessor to section 850.

Former section 851.5, provided in pertinent part: "If a person dies in possession of, or holding title to, real or personal property which, or some interest in which, is claimed to belong to another, or dies having a claim to real or personal property, title to or possession of which is held by another, *the executor, administrator, or any claimant* may file with the clerk of the court a verified petition setting forth the facts upon which the claim is predicated. . . ." (as amended by Stats. 1986, ch. 783, § 13, p. 2582, and repealed by Stats. 1987, ch. 923, § 41, p. 2987, italics added; see *Estate of Baumann* (1988) 201 Cal.App.3d 927, 933 [247 Cal.Rptr. 532].) Hence, under that provision, standing was expressly limited to the estate representative or a "claimant." As explained in *Estate of Scott* (1987) 197 Cal.App.3d 913 [243 Cal.Rptr. 93], a case relied upon by Leach, "[section 851.5] thus provides a vehicle for the executrix to recover property that belongs in the estate, or for a claimant to recover from the estate property that rightfully belongs to the claimant." (*Id.* at p. 918.) That is no longer true, however, since the current incarnation of section 850 is not limited to estate representatives and property "claimants." It has a broader standing provision, allowing any sufficiently "interested person," presumptively including a creditor, to also independently pursue such an order within the probate proceeding. *Estate of Scott* is consequently inapposite.

*Estate of Sayles* (1982) 130 Cal.App.3d 275 [181 Cal.Rptr. 543], was likewise decided pursuant to former section 851.5, and thus of little persuasive effect in ascertaining the parameters of standing under current section 850. But *Sayles* is inapposite for another reason, as well. In that case, the petitioner was claiming she personally had an "interest" in the property at issue, because she held an unrecorded deed of trust. She was not challenging the validity of any claim of title. The court noted that in cases arising under former section 851.5, "the claimant in each instance sought a declaration of

---

[2] Subdivision (b) of section 48 does allow the probate court a certain amount of leeway in determining whether, in a given situation, the degree of interest possessed is too remote to be significant: "The meaning of 'interested person' as it relates to particular persons may vary from time to time and shall be determined according to the particular purposes of, and matter involved in, any proceeding." There is no suggestion in this case, however, that Lissoy, the major creditor or Myers's estate, lacks a significant enough "interest" in the proceeding to confer standing. Certainly there would be no basis to summarily adjudicate that issue against him.

title, ownership, or possession of the property at stake" (130 Cal.App.3d at p. 279), and concluded petitioner's mere claim of an unrecorded security interest did not, in and of itself, rise to that level. "[The purpose of section 851.5 is to allow parties to] try the question of title to property as between a representative of the estate and strangers to the estate." (*Ibid.*)

In this case, by contrast to *Sayles*, the dispute at the center of the section 850 petition is about title to the Wellington property—specifically, whether title passed from Myers to Leach properly and unconditionally, as Leach contends; or was merely held by Leach pursuant to a plan to thwart Myers's creditors, as Myers's own will (and her apparent reimbursement of Leach's investment in the purchase) suggests may have been the case. Consequently, we conclude this case falls within the parameters of section 850.

### III

The final basis of the court's summary judgment in favor of Leach was the determination that Lissoy's sole means, within the probate proceeding, of attacking Myers's transfer of the Wellington property to Leach, was a demand that Sheppard pursue a claim on the estate's behalf pursuant to section 9653.

Section 9653 states in pertinent part: "(a) On application of a creditor of the decedent or the estate, the personal representative shall commence and prosecute an action for the recovery of real or personal property of the decedent for the benefit of creditors if the personal representative has insufficient assets to pay creditors and the decedent during lifetime did any of the following with respect to the property: [¶] (1) Made a conveyance of the property, or any right or interest in the property, that is fraudulent as to creditors under the Uniform Fraudulent Transfer Act . . . . [¶] . . . [¶] (b) A creditor making application under this section shall pay such part of the costs and expenses of the suit and attorney's fees, or give an undertaking to the personal representative for that purpose, as the personal representative and the creditor agree, or, absent an agreement, as the court or judge orders."

█ Nothing in the language of section 9653 suggests it is intended to be an exclusive remedy. However, Leach relies upon *Katz v. Driscoll* (1948) 86 Cal.App.2d 313 [194 P.2d 822], for the proposition that "[i]t has been held, however, that a creditor may not maintain an action to set aside a fraudulent conveyance, at least until the creditor has exhausted all means of procuring such an action to be brought by the executor or administrator." (*Id.* at p. 317.) Leach also points to *Emmons v. Barton* (1895) 109 Cal. 662, 667–668 [42 P. 303], *Liuzza v. Bell* (1940) 40 Cal.App.2d 417, 431 [104 P.2d 1095], and *Silva v. Superior Court* (1948) 83 Cal.App.2d 521 [189 P.2d 314].

Based upon these cases, Leach asserts that Lissoy is precluded from pursuing any claim "directly," without first "exhausting his remedy" under section 9653. However, while these cases are certainly venerable, it is not clear they remain apt. In fact, the Probate Code has been substantially overhauled with respect to the issues before us, since those cases were decided. *Katz, Liuzza* and *Silva* all interpret former section 579, while *Emmons* actually interprets former *Code of Civil Procedure* sections 1589 and 1590.

The changes within the Probate Code, and in particular the provision of section 850 which now allows an estate creditor to directly petition for certain orders within the probate proceeding itself, would seem to undercut the old rationale for precluding direct creditor actions. As explained in *Katz*, while " '[t]he primary object of [former section 579] is to enable the trustee to reduce that asset to possession and administer it for the benefit of creditors under the direction and supervision of the probate court [citation], the statute has as a secondary object *the prevention of complications that would result if several creditors were to pursue the remedy and seek to apply the property to their individual claims.*' " (*Katz v. Driscoll, supra*, 86 Cal.App.2d. 313, 317, quoting *Webb v. Pillsbury* (1943) 23 Cal.2d 324, 328 [144 P.2d 1], italics added.)

When the creditor seeks to pursue the fraudulent conveyance claim within the probate proceeding itself, as section 850 now permits, it not only fulfills the primary purpose of former section 579—to obtain the asset for the benefit of estate creditors—but it also avoids the "complications" which the *Katz* court was concerned would be presented if creditors were allowed to proceed individually. Significantly, Lissoy's petition *does not seek any exclusive individual recovery as a separate civil action would.* Instead, Lissoy's petition is designed to recover the proceeds of the property into the probate estate—and how those proceeds might be distributed within the estate proceeding is an issue his petition leaves for another day.[3]

In any event, contrary to Leach's argument, the court in *Silva* expressly concluded that the remedy provided in former section 579 "does not preclude

---

[3] Leach's contention that Lissoy's only alternative to section 9653 would be a separate civil action is clearly contrary to the goals of the probate process. It is just such independent actions, which might result in conflicting rights to recover the same assets by separate estate creditors, that the *Katz* court seems to be worried about. Distinct adjudications of creditor rights, outside the probate process, would seem likely to impede the orderly administration and distribution of the probate estate. But creditor actions under section 850 are part of the probate proceeding, and the probate court can thus ensure that whatever proceeds might be obtained will be distributed appropriately.

the defrauded creditor from maintaining an action in his own name to set aside the deed executed by the decedent to defraud creditors. [Citation.]" (*Silva v. Superior Court, supra,* 83 Cal.App.2d at p. 533.) The court explained that section 579 was merely "an enabling act authorizing the executor or administrator to sue under the specified circumstances. The representative of the estate may elect to bring the suit under proper circumstances, and when requested to do so by the creditor, who has made provision for the costs of litigation, it is his imperative duty to prosecute the action. [Citation.] The application of the preceding quoted section depends upon the existence of a defrauded creditor of the deceased, and the insufficiency of the assets of the estate to meet the demands. [Citation.]" (83 Cal.App.2d at p. 533.) We agree that even section 579 was a directive to the executor rather than the creditor.

But even assuming that a demand for action from the estate representative was intended to be Lissoy's sole means of asserting a fraudulent conveyance claim within the probate proceeding, as Leach contends, we would still conclude summary judgment was improperly granted on that basis here.

As explained in *Emmons v. Barton, supra,* 109 Cal. 662, and *Ohm v. Superior Court* (1890) 85 Cal. 545, 546 [26 P. 244], a creditor would have been excused from compliance with any requirement to demand action by the estate representative if circumstances demonstrated it would be futile to do so (as where the representative herself was the grantee of the disputed property), and would have been free to act independently if his demand to the estate representative were refused.

For purposes of summary judgment, those exceptions would be applicable here. Lissoy offered substantial evidence demonstrating that Sheppard, the estate representative, was (to put it colloquially) "in cahoots" with Leach in accomplishing the very fraudulent conveyance which is at the heart of this claim. It is undisputed that Sheppard and Leach are involved in a long-term romantic relationship, and Lissoy offered evidence they are actually married to each other. He also offered evidence demonstrating that Sheppard had previously stated (in the parties' underlying settlement agreement) that she believed there was no "legal merit" in any claims against "third parties," and that she had ignored three separate written demands from her siblings to pursue a claim against Leach.

While Leach dismisses all of this evidence as amounting to mere "speculation and innuendo" regarding whether Sheppard would be willing to

pursue a claim against Leach and whether she would be subject to any conflict of interest in doing so, we disagree. What Leach dismisses as "speculation and innuendo" are what we in the court system prefer to characterize as "inferences." And inferences, so long as they are reasonable, are a proper means of establishing facts. The inferences drawn by Lissoy are quite reasonable—some might say unavoidable. The evidence he offered, which we must accept as true, suggests quite clearly that Sheppard was not only unwilling to pursue any claim against Leach, but would have been a wholly inappropriate person to do so.

Admittedly, Sheppard herself is not the grantee of the Wellington property. But her husband is. Further, she is a coconspirator in the alleged fraudulent scheme to deprive Myers's creditors of the benefits of that property. Consequently, if Sheppard were to pursue the claim, she would, in effect, be accusing herself of fraud. We cannot draw any meaningful distinction between this situation and the one in *Emmons.*

In fact, Leach's suggestion that even if Sheppard had refused to pursue the claim, Lissoy should have been obligated to seek a court order *compelling* her to do so, reads like bad Kafka. Would any court actually issue an order compelling an estate representative to sue her own husband on a claim asserting that a real property transaction, in which she was personally complicit, constituted a fraud? Would the court actually require that the estate's creditor (in this case Lissoy) foot the bill for the expense associated with that charade?[4] We'd like to think not.

In our view, the evidence offered by Lissoy in opposition to the summary judgment motion was more than sufficient to demonstrate that Sheppard, the representative of Myers's estate, had refused to pursue any claim against Leach based upon the alleged fraudulent conveyance of the Wellington property,[5] and that it would have been futile and inappropriate to make any further attempt to force her to do so. On that basis, Lissoy would have been excused from any requirement (assuming one existed) to pursue his fraudulent conveyance claim exclusively by way of section 9653.

---

[4] Section 9653, subdivision (b).

[5] Leach suggests that Lissoy had an obligation to affirmatively allege the facts demonstrating that he had "exhausted his remedy" under section 9653, and that in the absence of such allegations, the court should have ignored this evidence. We cannot agree. In general, a plaintiff's failure to exhaust a mandatory remedy is a matter of defense which need not be pleaded in the complaint. (See *Green v. City of Oceanside* (1987) 194 Cal.App.3d 212 [239 Cal.Rptr. 470].)

The summary judgment is reversed, and the case is remanded for further proceedings. Lissoy is to recover his costs on appeal.

Moore, J., and Ikola, J., concurred.