Filed 6/28/13  Hasso v. Johnson CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| ALAN HASSO, | |
| Plaintiff and Appellant, | E053666 |
| v. | (Super.Ct.No. RIC369859) |
| JESSE JOHNSON et al., | OPINION |
| Defendants and Respondents. | |

APPEAL from the Superior Court of Riverside County.  Gary B. Tranbarger, Judge.  Affirmed.

Michael Creamer for Plaintiff and Appellant.

Mundell, Odlum & Haws, Karl N. Haws and Jim C. Moore for Defendants and Respondents.

Following a one-day bench trial, judgment was entered in favor of defendants and respondents Jesse Johnson (Jesse) and Wynema Johnson (Defendants) and against plaintiff and appellant Alan Hasso (Plaintiff) in his action to set aside the conveyance of a single family residence valued at $264,000 on April 12, 1996, on the grounds that it was

1

fraudulent. Plaintiff appeals, contending the trial court erred (1) in failing to apply the common law remedies previously available to creditors in a fraudulent conveyance action, and (2) in failing to allow the underlying monetary judgment to relate back to the date when Plaintiff's claim arose.

## I. PROCEDURAL BACKGROUND AND FACTS

Plaintiff and Dr. D. Robert Johnson and his wife Odette Johnson (Mrs. Johnson) (the Johnsons) had a business relationship involving La Sierra Financial, Inc. prior to the litigation relationship that began in 1990. The Johnsons were the first to file a lawsuit against Plaintiff that resulted in a multi-million dollar verdict. Plaintiff initiated actions against various business entities, the Johnsons, Defendants, and others. Between 2000 and 2001, Plaintiff obtained a series of default judgments against the Johnsons, among others. On January 16, 2002, Plaintiff initiated this action against the Johnsons and their children (the Johnson Children) and others, claiming, among other things, that the Johnsons fraudulently transferred real property to their children in order to avoid default judgments. After several successful demurrers against Plaintiff, he filed a Fourth Amended Complaint on June 18, 2003, for fraudulent conveyance and "'conspiracy to commit fraudulent conveyance'" against the Johnson Children and others.[1]

---

[1] Plaintiff has failed to provide this court with the operative pleadings, and therefore it is difficult to ascertain the specific causes of actions alleged. Thus, we rely on the parties' briefs submitted at trial and on appeal, along with their statements and arguments, together with the trial court's statement of decision.

2

On September 8, 2008, Plaintiff and the Johnson Children entered into a settlement agreement on the record, in open court. According to the terms of the settlement agreement, Plaintiff and the Johnson Children agreed that upon the payment of $50,000.00 to Plaintiff, he would dismiss the lawsuit in its entirety and with prejudice as to the Johnson Children, excepting only a single factual issue to be tried before the court at a later date. They further agreed that the only issue to be tried would be whether the Johnsons' birthday gift of a single family residence to their son, Jesse, in 1996 (1996 gift) was a fraudulent conveyance under California law.

A court trial was held on January 4, 2011. Each side submitted trial briefs. On December 30, 2010, Defendants filed their trial brief, which invoked the Uniform Fraudulent Transfer Act (UFTA), Civil Code section 3439 et seq.[2] as the law governing the narrow factual issue. They argued that "[u]nder the rules applicable to this action, to prevail [Plaintiff] must establish that the transfer to Jesse Johnson from his mother was a fraudulent conveyance under either . . . section 3439.04 or . . . section 3439.05. Under . . . section 3439.04, [Plaintiff] must prove that he had a claim against the Johnsons and that the transfer was made by Mrs. Johnson both with actual intent to hinder or delay [Plaintiff's] collection on the claim and with the intention to incur debts beyond her ability to pay them as they became due. Alternatively, under . . . section 3439.05, [Plaintiff] must prove that he had a claim against Mrs. Johnson before the April, 1996,

---

[2] All further statutory references are to the Civil Code unless otherwise indicated.

transfer and that she was insolvent at the time of the transfer or became insolvent as a result of the transfer." (Underlining in original.)

On or about January 3, 2011, Plaintiff filed his trial brief. In his brief, he agreed in all material respects with Defendants' assessment of the governing California law and, in accord with Defendants, expressly invoked section 3439.05. Citing the UFTA and section 3439.11, Plaintiff argued that "for more than 70 years, it has been California law that California's law on fraudulent transfers should be interpreted to make it uniform with that of other jurisdictions." (Capitalization omitted.) Plaintiff cited New York law to define insolvency, and Illinois law holding that "insolvency was not a mathematical formula, but that where a transfer impacts the rights of a creditor and a judgment has not been collected, a determination of insolvency results as a matter of law." Citing Alabama law, Plaintiff argued that "'[t]he debtor-creditor relationship is created not by a judgment, but by the wrong which produces the injury; and it is the date of the wrongful act, not the date of the filing of the suit or of the judgment, which fixes the status and rights of the parties.'" Further, Plaintiff noted that "where there are transfers between family members, the plaintiff need only establish that his or her debt 'antedated the conveyance.'"

On January 4, 2011, a court trial commenced on the issue of whether the 1996 gift was a fraudulent conveyance under section 3439 et seq. The parties, along with the trial court, expressly agreed that Plaintiff only sought a factual finding (without a claim for damages or other remuneration from Defendants) because his sole purpose for seeking

4

such factual finding was to potentially file a claim against other, uninvolved third parties (i.e., title company) at a later time.

Prior to the presentation of oral testimony, the trial court summarized, without objection, everyone's mutual understanding of the narrow scope of the hearing:

"THE COURT:  I understand under the settlement that I'm going to take testimony and make a decision about whether or not that transfer from mother to son was or was not a fraudulent conveyance under the statute. . . .

"[COUNSEL FOR PLAINTIFF]:  Okay.

"THE COURT:  And other than answering that question, 'yes' or 'no,' I don't think there's anything else for me to do, because I think under the terms of the settlement, your side has agreed that that's the only remedy you are going to seek in this proceeding. You are going to take that finding and perhaps engage in further litigation with subsequent purchasers.  [¶] . . . [¶]

"THE COURT:  I don't think under the settlement you can ask me for any remedy other than to answer that 'yes' or 'no' question.  Now before you answer that question, is that your understanding?

"[COUNSEL FOR DEFENDANTS]:  That is my precise understanding."

Three witnesses testified:  Plaintiff, Mrs. Johnson, and Jesse.  The testimony focused on the value of Mrs. Johnson's assets at the time of the 1996 transfer to her son in comparison to the viability and value of Plaintiff's actual, pre-April 1996 claims against the Johnsons.  Mrs. Johnson testified that by 1996, her husband had already been a practicing orthopedic surgeon for approximately 28 years, and that his regular annual

5

income for the years prior to 1996 was between $500,000 and $1.5 million dollars per year. She stated that from the time her husband began practicing medicine, she had used their substantial income to purchase numerous parcels of real estate outright and without debt. She testified as to the real estate and business assets owned by the Johnsons as of April 1996, along with the 1996 values as listed in Exhibit 503, identified as Exhibit 76 in the record before this court. The total value of the Johnsons' assets in 1996 was approximately $11 million. Additionally, Mrs. Johnson testified that by 1996 she had obtained a $2.8 million judgment against Plaintiff and/or entities he controlled for defrauding the Johnsons in a prior series of transactions, bringing her total assets to at least $13.8 million.

Jesse testified that during the period of the 1996 transfer, he had been assisting his mother in setting up "QuickBooks." Although he could not recall the exact amounts, he recalled his parents' assets in 1996 ranging in the "large millions of dollars."

Plaintiff testified that about 1993 the Johnsons had obtained a $2.3 million [3] judgment, including $1.5 million in punitive damages against La Sierra Financial, an entity Plaintiff controlled and for which he served as chairman of the board of directors until 1992. He stated that once La Sierra Financial declared bankruptcy, the bankruptcy trustee filed a lawsuit against him for fraudulent conveyance of La Sierra Financial's assets. He further testified that some time in 1993 or 1994, the Johnsons' independent financial advisor told him that the Johnsons had a net worth of approximately $16

---

[3] According to Mrs. Johnson, the judgment was for $2.8 million.

million.  Plaintiff provided no detailed personal testimony or personal analysis at trial of either Mrs. Johnson's net worth or the value of Mrs. Johnson's 1996 individual assets listed on Exhibit 503, i.e., Exhibit 76, or of the 1996 value of his alleged cross-claims.

Regarding the 1996 gift, Mrs. Johnson testified that in 1994 she used less than two percent of her wealth to purchase a residence for her son Jesse, valued between $177,000.00 and $264,000.00.  She stated that she held the note on the property and that Jesse made payments to her during the period of his ownership in order for him to take advantage of the relaxed tax benefits.  She added that although she held the note on the property between 1994 and 1996, in 1994 she intended to gift the home to Jesse, that she would not have foreclosed on her son in the event he failed to make any payment, and that she merely made the gift official in 1996 by reconveying her interest in it back to Jesse at his birthday party.

Jesse testified that he was the titled owner of the residence from the date of purchase until he sold it prior to 2003.  Both Mrs. Johnson and Jesse confirmed that on April 12, 1996, Mrs. Johnson gifted the residence to Jesse and his wife.  She forgave the outstanding loan balance on the home and reconveyed her interest in it to Jesse as she had done for her other children.  According to Mrs. Johnson, this reconveyance had no impact on her or her husband's substantial wealth or their ability to meet their obligations as they became due.  A schedule of real estate and business assets owned by the Johnsons in April 1996 was introduced into evidence.  Included in the schedule were the "Richardson Acreage" and the "Main St. Block" in the City of Corona (Corona City Block).

7

As part of the Johnsons' estate planning, Mrs. Johnson testified that in 1996 she transferred most of her real estate holdings into the "D. Robert Johnson Family Projects, a California Limited Partnership," retaining full power, control, and authority over the assets in order to manage and/or convey them as necessary. Jesse testified that in 1996 he had accompanied his parents and siblings to an attorney's office to finalize the partnership for his parents' estate planning. He explained that the sole purpose of the partnership was for estate planning purposes of managing his parents' assets with his parents retaining full control of the assets placed into it.

Plaintiff acknowledged that approximately two weeks prior to the 1996 gift, Plaintiff had been indicted and was on trial as a federal criminal defendant for having "knowingly devised and intended to devise a scheme in artifice fraud to obtain money by means of false and fraudulent pretenses, misrepresentations, promises including the intentional concealment of material facts from Robert and Odette Johnson. . . ." Plaintiff admitted he was convicted, incarcerated, and placed on probation for three years without the right to open a checking account without his probation officer's approval. His claims that existed and were pending against Mrs. Johnson as of the 1996 gift consisted of certain pending lawsuits, some of which were not documented at trial. Of the documented lawsuits before this court, we note the following were filed after April 1996: (1) Orange County Superior Court case No. 795613, Plaintiff's cross-complaint filed August 6, 1998, resulting in a judgment by default; (2) Orange County Superior Court case No. 795613, cross-complaint of Plaintiff's wife filed August 12, 1998, resulting in a judgment by default; (3) Orange County Superior Court case No. 806730 filed March 12,

8

1999, resulting in a judgment by default; and (4) Orange County Superior Court case No. 809104 filed on May 7, 1999. The record contains a complaint in Orange County Superior Court case No. 760891 filed on March 13, 1996; however, there is no indication of the outcome of this case. The record also contains a judgment by default in Riverside County Superior Court case No. 332324; however, there is no indication when the case was initially filed.

The only cases before this court that were filed prior to April 1996 are Orange County Superior Court case No. 760891 filed March 13, 1996 (OC760891 case) and Riverside County Superior Court case No. INC246345, to which a cross-complaint by Plaintiff's wife was filed on May 23, 1994 (INC246345 case) and resulted in a $2.5 million nonadjudicated, default judgment against the Johnsons. Plaintiff testified that the OC760891 case resulted in a default judgment against the Johnsons for $1.975 million on May 31, 2001, in Orange County Superior Court case No. 806730 via a stipulation. However, Plaintiff offered no documentary evidence linking the two cases. The INC246345 case alleged fraudulent conveyance, conspiracy to commit the same, and aiding and abetting the same where the Johnsons were the actual plaintiffs in the underlying case.

Plaintiff's second amended cross-complaint in the INC246345 case was dated March 24, 1998, for malicious prosecution and breach of fiduciary duty, among other claims. On May 1, 2000, Plaintiff obtained a nonadjudicated default judgment against the Johnsons on his second amended cross-complaint for $3.4 million. Although there is evidence that Plaintiff's wife's cross-complaint was filed prior to April 1996, Plaintiff

9

failed to establish that his cross-complaint or first amended cross-complaint was filed prior to the 1996 gift.

At the end of trial, the trial court and counsel agreed that the parties would end the proceedings by making final written submissions to the court, consisting of (1) mutual expert declarations on the 1996 value of the Richardson Acreage and the Corona City Block only, and that closing arguments would be in the form of posttrial briefs.

The parties' closing briefs reiterated that sections 3439.04 and 3439.05 governed the inquiry at trial. Regarding the common law, Plaintiff argued: "Under the common law, the UFCA, and the UFTA, only three elements are necessary in order to establish a fraudulent transfer based on constructive fraud: [¶] 1. Creditor status at the time of a transfer. [¶] 2. That the transfer was made without fair consideration. [¶] 3. Resultant insolvency. [¶] However, if there was a pending action against the transferor and there is a judgment on the pending action as to which collection efforts are not successful, a *prima facie* case of resultant insolvency is established as a matter of law." Plaintiff recognized that the same three prong analysis for constructive fraudulent conveyance is spelled out in section 3439 et seq. Defendants' closing brief was in accord regarding the legal analysis for actual and constructive fraudulent conveyance in California, also relying on and applying sections 3439.04 and 3439.05. In addition to the closing briefs, the parties submitted their respective expert declarations. According to Defendants' expert, Patrick J. Meyer, both the Richardson Acreage and Corona City Block were unique and desirable parcels in 1996. Meyer was the owner of Urban Environs, a land use consulting, real estate development and urban planning firm specializing in projects

10

within the Inland Empire. After physically inspecting and analyzing both sites, Meyer declared that in 1996, the Richardson Acreage, consisting of 11 residential lots overlooking "the entire San Bernardino Valley [with] a particularly spectacular view of Loma Linda and the surrounding area," was worth approximately $2.5 million at the time of the 1996 gift. The Corona City Block consisted of "an entire contiguous block" on Corona's main thoroughfare with frontage and access on all four sides in an area zoned for medical clinics and convalescent hospitals which he valued at approximately $1.5 million at the time of the 1996 gift.

Plaintiff's expert, Robert M. Taylor, president of Robert M. Taylor Corporation, dba the REMM Group, which had been appointed as a receiver over the real property of D. Robert Johnson Family Projects since 2001, opined that the Corona City Block had a commercial value was $2.1 million in 2005, and that since California real estate values in 1996 "were generally 50% of the value for the same property in calendar year 2005," the Corona City Block was likely worth $1,050,000 in 1996. He opined that the Richardson Acreage was valued at less than its alleged 1998 value of $600,000, but did not specify the precise basis for that assessment.

On February 25, 2011, the trial court found in favor of Defendants.[4] Regarding actual intent to defraud, the court found that the sole motivation for the 1996 gift was parental love and the desire to treat Jesse the same as his siblings. Mrs. Johnson did not

---

[4] On May 10, 2012, Plaintiff filed a motion to augment the record, which we deemed a motion to take evidence on appeal. We reserved ruling for consideration with the appeal. We deny the motion.

believe the 1996 gift would have any significant impact on her and her husband's lifestyle or solvency, and she did not believe that any pending lawsuits against her had any value. The court found the following corroborating evidence: Jesse's siblings received similar gifts; other than residences, the Johnson children did not receive other significant transfers; the 1996 gift was acquired specifically for the purpose of providing a residence to Jesse and his family; the 1996 gift was given to Jesse on his birthday; the 1996 gift represented between three to eight percent of Mrs. Johnson's total real estate assets at the time of the transfer; and although Plaintiff prevailed in his lawsuits, reasonable grounds existed to suggest that he would not have prevailed.

Regarding the issue of constructive fraud, the court was troubled because a prima facie case was presented, given the benefit of hindsight, i.e., at the time of the 1996 gift, the value of the pending lawsuits exceeded Mrs. Johnson's total assets and she received no consideration from Jesse for the residence. However, the court also noted that (1) Plaintiff previously had not been a successful litigant in his actions against the Johnsons; (2) the actual merits of his actions were never litigated; and (3) there were no findings as to such merits other than to conclude that Plaintiff failed to prove that (a) Mrs. Johnson was aware the lawsuits would produce judgments that would exceed her assets; and (b) a reasonable person in April 1996 with knowledge of the lawsuits and the Johnson assets would have known the Johnsons would ultimately be unable to fully satisfy any judgment resulting from the lawsuits as a result of the 1996 gift.

12

## II.  INVITED ERROR DOCTRINE

Defendants contend Plaintiff is barred from challenging the trial court's application of the statutory law regarding fraudulent transfers on the ground that he invited any error by expressly advocating its application.  We agree.

"The invited error doctrine is an application of the estoppel principle that where a party by his or her conduct induces the commission of error, he or she is estopped from asserting it as a ground for reversal on appeal.  [Citation.]  However, 'the invited error doctrine requires affirmative conduct demonstrating a deliberate tactical choice on the part of the challenging party.  [Citations.]'  [Citation.]"  (*Pioneer Construction, Inc. v. Global Investment Corp.* (2011) 202 Cal.App.4th 161, 169.)  "'Thus where a deliberate trial strategy results in an outcome disappointing to the advocate, the lawyer may not use that tactical decision as the basis to claim prejudicial error.'  [Citation.]"  (*Van Sickle v. Gilbert* (2011) 196 Cal.App.4th 1495, 1528.)  Here, the record supports application of the invited error doctrine.  The court and the parties tried the case under the UFTA, not the common law.[5]  As Defendants point out, the testimonies of the witnesses focused on four areas, which are in accord with section 3439:  (1) the nature and value of Plaintiff's claims (only the ones that were viable prior to April 1996); (2) Mrs. Johnson's assets at the time of the 1996 gift; (3) Mrs. Johnson's intent regarding the transfer; and (4) the

---

[5]  According to *Macedo v. Bosio* (2001) 86 Cal.App.4th 1044, 1051, "the UFTA is not the exclusive remedy by which fraudulent conveyances and transfers may be attacked. . . .  They may also be attacked by, as it were, a common law action."  However, we have not been provided with a copy of Plaintiff's complaint so that we may assess whether he initiated this action under the common law.  Thus, we must discern which remedy Plaintiff pursued by reviewing his trial brief, evidence, and closing brief.

objective comparison between the value of Plaintiff's pending claims, Mrs. Johnson's assets, and the 1996 gift.

Even Plaintiff's posttrial brief relied on the three-prong standard of section 3439.05, expressly declaring that it was identical to the common law standard. In the brief, Plaintiff argued that the statute's indicia of intentional fraud applied to Mrs. Johnson. He stated: "Under the common law, UFCA, and the UFTA, only three elements are necessary in order to establish a fraudulent transfer based on constructive fraud: (1) Creditor status at the time of a transfer[,] 2. [t]hat the transfer was made without fair consideration[,] [and] 3. [r]esultant insolvency." Moreover, Plaintiff failed to utilize any posttrial/pre-appeal procedures available for bringing the alleged "errors" to the trial court's attention.[6]

### III. SECTION 3439 AND COMMON LAW

Notwithstanding the above, even if we were to consider the merits of Plaintiff's issue, we conclude that whether the trial court applied the common law or the statutory law, Plaintiff would not have prevailed.

As to present and future creditors, section 3439.04 provides, in relevant part: "(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows: [¶]

---

[6] Although Defendants further contend that Plaintiff has forfeited his right to appeal the issue he raises because he never availed himself of any of the well-established procedures for bringing any alleged "errors" to the court's attention, we need not consider this issue because we have concluded that the invited error doctrine applies.

14

(1)  With actual intent to hinder, delay, or defraud any creditor of the debtor.  [¶]

(2)  Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor . . . .  [¶]  . . . [¶]  (B)  Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due."  (§ 3439.04, subd. (a).)  As to present creditors, section 3439.05 provides:  "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."

The term "claim" is defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  (§ 3439.01, subd. (b).)  The term "creditor" is defined as "a person who has a claim . . . ."  (§ 3439.01, subd. (c).)  "A creditor who is damaged by a transfer described in either section 3439.04 or section 3439.05 can set the transfer aside or seek other appropriate relief under section 3439.07."  (*Cortez v. Vogt* (1997) 52 Cal.App.4th 917, 928.)  Section 3439.07 provides such remedies as avoidance of the transfer, attachment, injunction, appointment of a receiver, and levy.  (§ 3439.07.)  More importantly, section 3439 et seq., codified preexisting California law governing fraudulent transfers such that the UFTA's aforementioned remedies and its limitations period are cumulative to include those remedies and

15

limitations periods available prior to its 1987 enactment. (*Macedo v. Bosio*, *supra*, 86 Cal.App.4th at pp. 1051-1052.)

According to Plaintiff, under the common law he was only required to prove "(1) that the grantor was indebted to [the creditor] at the time of the transfer; (2) that the conveyance was [made without consideration or for mere nominal consideration]; and (3) that the grantor failed to retain sufficient property to pay his indebtedness to the [creditor] in full-not merely at the time of the transfer, but in the final analysis when the creditor seeks to collect his debts."

Applying either of the above standards as set forth in the common law or in section 3439 et seq., we conclude, contrary to Plaintiff's contention, that Plaintiff failed to meet his burden. Clearly, the Johnson's 1996 gift was made without monetary consideration (i.e., they gifted a home to their son and his wife). Thus, we need not consider this element. Regarding indebtedness, the only evidence offered to the trial court was Plaintiff's actions filed against the Johnsons, which later ended via default judgments. Plaintiff faults the trial court for failing to allow the underlying monetary judgments to relate back to the date when Plaintiff's claim arose. According to the record before this court, there was only one viable monetary judgment that qualified as a debt, namely, the INC246345 case. The INC246345 case resulted in a $2.5 million nonadjudicated default judgment against the Johnsons and it was filed prior to April 1996.

As to actual intent to defraud, the trial court observed: "While plaintiff ultimately prevailed in his lawsuits, reasonable grounds existed to support [Mrs.] Johnson's

16

subjective belief in April 1996 that the lawsuits were meritless: (a) prior jury verdicts in favor of the Johnsons against the plaintiff, and (b) the pendency of criminal charges against the plaintiff for his alleged fraud against the Johnsons."

On the issue of constructive fraud, the trial court found that the facts presented a prima facie case; however, such case "presumes the value of any lawsuit plaintiff may have filed against [the Johnsons] before April 1996 was of strong merit and worth over 15 million dollars. Given that the lawsuit was for Malicious Prosecution, and given that in April of 1996 plaintiff had not yet been the successful litigant in earlier civil litigation (a pre[]requisite for a successful Malicious Prosecution lawsuit) or pending criminal litigation (normally a real-world pre-requisite for a successful Malicious Prosecution lawsuit) or pending criminal litigation (normally a real-world pre-requisite for a successful Malicious Prosecution lawsuit), it is difficult to maintain such a presumption. The actual merits of such lawsuits were not litigated in this case (nor in any other case as the plaintiff obtained default judgments), and the court makes no findings as to such merits other tha[n] to conclude that plaintiff has failed to prove (1) that [Mrs.] Johnson was subjectively aware that said lawsuits would ultimately expose her to money judgments exceeding her assets; or (2) that a reasonable person, in April 1996, with knowledge of all the lawsuits then pending among plaintiff and the Johnsons, and with knowledge of all of the assets of the Johnsons in April 1996, would have known, or should have known, that the Johnsons would ultimately be unable to fully satisfy any judgment of plaintiff as a result of the transfer at issue." The evidence presented at trial supports the court's findings. As we have already observed, there was only one lawsuit

17

filed prior to April 1996 that resulted in a default judgment in the amount of $2.5 million. None of the other default judgments traced back to any claims filed prior to April 1996.

As to the last element regarding whether Mrs. Johnson failed to retain sufficient assets to pay off any debt to Plaintiff at the time of the 1996 gift, the court observed that the 1996 gift was "somewhere between 3% to 8% of [Mrs. Johnson's] total real estate assets at the time of the transfer." Regarding constructive fraud, the court added that the 1996 gift "did not leave [Mrs.] Johnson's assets unreasonably small in relation to potential claims on the assets, and that the transfer had a relatively small effect on the relationship of assets to potential claims on assets," and that "[Mrs.] Johnson was not insolvent in April of 1996, or for over three years thereafter." Because Plaintiff failed to provide any evidence to contradict the evidence offered by Mrs. Johnson, the record before this court supports the trial court's decision. Mrs. Johnson testified that by 1996 she had obtained a $2.8 million judgment against Plaintiff and/or entities he controlled for defrauding the Johnsons, and that her total assets were, at least, $13.8 million dollars. Jesse recalled his parents' assets in 1996 ranging in the "large millions of dollars." In comparison, the 1996 gift was valued between $177,000.00 and $264,000.00. As to the Johnsons transfer of their assets into the partnership, Mrs. Johnson testified that she retained full power, control, and authority over the assets in order to manage and/or

18

convey them as necessary. All things considered, the evidence shows that Mrs. Johnson's 1996 assets outweighed Plaintiff's pre-April 1996 claim.[7]

As a final note, Defendants contend that Plaintiff's "basic premise that the trial court's analysis denied him an appropriate 'remedy,' (common law or otherwise) is further mooted by the undisputed terms of the September 8, 2008 settlement agreement which limited any remedy he might have received to a mere finding of fraudulent conveyance alone without further remuneration from [Defendants.]" (Underlining in original.) We agree.

## IV. DISPOSITION

The judgment is affirmed. Costs are awarded to Defendants.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

       HOLLENHORST
                        J.

We concur:

      RAMIREZ
                P.J.

      MCKINSTER
                J.

---

[7] At worst, the Johnsons' $2.8 million judgment cancelled out Plaintiff's $2.5 million default judgment.

19